Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

---

# FORM 10-Q

---

x    **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Quarterly Period Ended December 31, 2008**

OR

¨    **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from _____ to _____.**

**Commission File Number: 000-51539**

---

# VISTAPRINT LIMITED
### (Exact Name of Registrant as Specified in its Charter)

---

| **Bermuda** | **98-0417483** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**Canon's Court**
**22 Victoria Street**
**Hamilton, HM 12**
**Bermuda**
(Address of Principal Executive Offices, Including Zip Code)

**441-295-2244**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes   x       No   ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (check one):

Large accelerated filer   x                                              Accelerated filer   ¨

Non-accelerated filer   ¨    (Do not check if a smaller reporting company)        Smaller Reporting Company   ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes   ¨    No   x

As of January 27, 2009, there were outstanding 42,137,732 of the registrant's common shares, par value $0.001 per share.

Table of Contents

# FORM 10-Q

## INDEX

|  |  |  | Page |
|---|---|---|---|
| **PART I FINANCIAL INFORMATION** | | | 3 |
| ITEM 1: | Financial Statements | | 3 |
| | Unaudited Condensed Consolidated Balance Sheets as of December 31, 2008 and June 30, 2008 | | 4 |
| | Unaudited Condensed Consolidated Statements of Income for the three and six months ended December 31, 2008 and 2007 | | 5 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the six months ended December 31, 2008 and 2007 | | 6 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | | 7 |
| ITEM 2: | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 12 |
| ITEM 3: | Quantitative and Qualitative Disclosures About Market Risk | | 18 |
| ITEM 4: | Controls and Procedures | | 19 |
| **PART II OTHER INFORMATION** | | | 19 |
| ITEM 1: | Legal Proceedings | | 19 |
| ITEM 1A: | Risk Factors | | 21 |
| ITEM 2: | Unregistered Sales of Equity Securities and Use of Proceeds | | 36 |
| ITEM 3: | Defaults Upon Senior Securities | | 37 |
| ITEM 4: | Submission of Matters to a Vote of Security Holders | | 37 |
| ITEM 5: | Other Information | | 37 |
| ITEM 6: | Exhibits | | 37 |
| | Signatures | | 38 |
| **EXHIBIT INDEX** | | | 39 |

2

Table of Contents

**PART I. FINANCIAL INFORMATION**

**ITEM 1.    FINANCIAL STATEMENTS**

**VISTAPRINT LIMITED**
**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Unaudited Condensed Consolidated Balance Sheets | 4 |
| Unaudited Condensed Consolidated Statements of Income | 5 |
| Unaudited Condensed Consolidated Statements of Cash Flows | 6 |
| Notes to Unaudited Condensed Consolidated Financial Statements | 7 |

3

Table of Contents

# VISTAPRINT LIMITED
## CONDENSED CONSOLIDATED BALANCE SHEETS
### (Unaudited in thousands, except share and per share data)

|  | December 31, 2008 | June 30, 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 97,892 | $ 103,145 |
| Marketable securities | 13,123 | 26,598 |
| Accounts receivable, net of allowances of $200 and $213 at December 31, 2008 and June 30, 2008, respectively | 4,989 | 6,105 |
| Inventory | 4,069 | 2,548 |
| Prepaid expenses and other current assets | 7,202 | 5,678 |
| Total current assets | 127,275 | 144,074 |
| Property, plant and equipment, net | 174,646 | 154,520 |
| Software and web site development costs, net | 5,992 | 5,380 |
| Deferred tax assets | 2,956 | 2,956 |
| Other assets | 9,655 | 9,022 |
| Total assets | $ 320,524 | $ 315,952 |
| | | |
| **Liabilities and shareholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 12,506 | $ 8,486 |
| Accrued expenses | 47,528 | 35,655 |
| Deferred revenue | 2,516 | 1,893 |
| Current portion of long-term debt | 8,977 | 3,304 |
| Total current liabilities | 71,527 | 49,338 |
| Deferred tax liability | 2,578 | 2,656 |
| Other liabilities | 3,905 | 1,946 |
| Long-term debt | 11,432 | 19,507 |
| Commitments and contingencies (Note 6) | | |
| Shareholders' equity : | | |
| Common shares, par value $0.001 per share, 500,000,000 shares authorized; 43,878,282 and 44,279,248 shares issued and 42,091,892 and 44,279,248 shares outstanding at December 31, 2008 and June 30, 2008, respectively | 45 | 44 |
| Treasury shares, at cost: 1,786,390 shares at December 31, 2008 | (27,111) | — |
| Additional paid-in capital | 185,237 | 191,271 |
| Retained earnings | 69,921 | 43,098 |
| Accumulated other comprehensive income | 2,990 | 8,092 |
| Total shareholders' equity | 231,082 | 242,505 |
| Total liabilities and shareholders' equity | $ 320,524 | $ 315,952 |

See accompanying notes.

4

Table of Contents

# VISTAPRINT LIMITED
## CONDENSED CONSOLIDATED STATEMENTS OF INCOME
### (Unaudited in thousands, except share and per share data)

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| Revenue | $ 138,903 | $ 105,017 | $ 253,135 | $ 184,470 |
| Cost of revenue (1) | 50,692 | 39,896 | 95,536 | 69,648 |
| Technology and development expense (1) | 15,246 | 11,124 | 29,054 | 20,232 |
| Marketing and selling expense (1) | 42,683 | 34,123 | 77,484 | 60,439 |
| General and administrative expense (1) | 9,629 | 8,076 | 20,576 | 15,445 |
| Income from operations | 20,653 | 11,798 | 30,485 | 18,706 |
| Interest income | 564 | 1,147 | 1,291 | 2,321 |
| Other income (expense), net | (426) | 100 | (1,366) | 98 |
| Interest expense | 353 | 421 | 733 | 856 |
| Income before income taxes | 20,438 | 12,624 | 29,677 | 20,269 |
| Income tax provision | 1,889 | 1,455 | 2,854 | 2,220 |
| Net income | $ 18,549 | $ 11,169 | $ 26,823 | $ 18,049 |
| Basic net income per share | $ 0.43 | $ 0.25 | $ 0.61 | $ 0.41 |
| Diluted net income per share | $ 0.42 | $ 0.24 | $ 0.59 | $ 0.39 |
| Weighted average common shares outstanding – basic | 43,297,815 | 43,838,575 | 43,838,748 | 43,691,390 |
| Weighted average common shares outstanding – diluted | 44,253,345 | 46,313,960 | 45,133,894 | 46,056,567 |

(1)    Share-based compensation cost is allocated as follows:

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| | | (Unaudited) (in thousands) | | |
| Cost of revenue | $ 186 | $ 210 | $ 382 | $ 345 |
| Technology and development expense | 1,196 | 1,056 | 2,460 | 1,861 |
| Marketing and selling expense | 985 | 989 | 2,022 | 1,805 |
| General and administrative expense | 2,428 | 1,434 | 5,419 | 2,719 |
| | $ 4,795 | $ 3,689 | $ 10,283 | $ 6,730 |

See accompanying notes.

5

Table of Contents

# VISTAPRINT LIMITED
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (Unaudited in thousands)

| | Six Months Ended December 31, | |
|---|---|---|
| | 2008 | 2007 |
| **Operating activities** | | |
| Net income | $ 26,823 | $ 18,049 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 16,646 | 11,068 |
| Loss on disposal of long-lived assets | — | 50 |
| Write-off of long-lived assets | 1,331 | 62 |
| Share-based compensation expense | 10,283 | 6,730 |
| Tax benefits derived from share-based compensation awards | (28) | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 979 | 1,344 |
| Inventory | (1,628) | (1,176) |
| Prepaid expenses and other assets | (2,046) | (3,119) |
| Accounts payable | 3,848 | 5,432 |
| Accrued expenses and other current liabilities | 16,496 | 13,590 |
| Net cash provided by operating activities | 72,704 | 52,030 |
| **Investing activities** | | |
| Purchases of property, plant and equipment | (41,500) | (34,692) |
| Purchases of marketable securities | (6,078) | (28,970) |
| Sales of marketable securities | 18,837 | 32,597 |
| Purchase of intangible assets | — | (1,250) |
| Capitalization of software and website development costs | (3,327) | (2,155) |
| Net cash used in investing activities | (32,068) | (34,470) |
| **Financing activities** | | |
| Repayments of long-term debt | (1,624) | (1,611) |
| Payment of withholding taxes in connection with vesting of restricted share units | (1,405) | (1,583) |
| Repurchase of common shares | (45,518) | — |
| Tax benefits derived from share-based compensation awards | 28 | — |
| Proceeds from issuance of common shares | 3,285 | 5,822 |
| Net cash (used in) provided by financing activities | (45,234) | 2,628 |
| Effect of exchange rate changes on cash | (655) | 530 |
| Net (decrease) increase in cash and cash equivalents | (5,253) | 20,718 |
| Cash and cash equivalents at beginning of period | 103,145 | 69,464 |
| Cash and cash equivalents at end of period | $ 97,892 | $ 90,182 |

See accompanying notes.

6

Case4:08-cv-05261-SBA    Document21-2     Filed03/13/09    Page8 of 58

Table of Contents

## VISTAPRINT LIMITED
## NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (in thousands, except share and per share data)

### 1. Description of the Business

VistaPrint Limited, a Bermuda company (the "Company"), offers small businesses the ability to market their business with a broad range of brand identity and promotional products, marketing services and electronic solutions. Through the use of proprietary Internet-based graphic design software, localized websites, proprietary order receiving and processing technologies and advanced computer integrated production facilities, the Company offers a broad spectrum of products ranging from business cards and brochures to invitations and holiday cards. The Company focuses on serving the marketing, graphic design and printing needs of the small business market, generally businesses or organizations with fewer than 10 employees. The Company also provides similar products and services to the consumer market.

### 2. Summary of Significant Accounting Policies

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and, accordingly, do not include all of the information and footnotes required by U.S. generally accepted accounting principles for complete financial statements. The accompanying unaudited condensed consolidated financial statements include the accounts of VistaPrint Limited and its wholly owned subsidiaries. In the opinion of management, all adjustments, consisting primarily of normal recurring accruals, considered necessary for a fair presentation of the results of operations for the interim periods reported and of the Company's financial condition as of the date of the interim balance sheet have been included. Operating results for the three and six months ended December 31, 2008 are not necessarily indicative of the results that may be expected for the year ending June 30, 2009 or for any other period.

The condensed consolidated balance sheet at June 30, 2008 has been derived from the Company's audited consolidated financial statements at that date but does not include all of the information and footnotes required by U.S. generally accepted accounting principles for complete financial statements.

**Inventories**

Inventories consist primarily of raw materials and are stated at the lower of first-in, first-out cost or market.

**Net Income Per Share**

The Company calculates net income per share in accordance with Statement of Financial Accounting Standards ("SFAS") No. 128, Earnings Per Share. Basic net income per share is computed by dividing net income by the weighted-average number of common shares outstanding for the applicable fiscal periods. Diluted net income per share is computed using the treasury stock method. Diluted net income per share gives effect to all potentially dilutive securities, including share options and restricted share units ("RSUs") using the treasury stock method. Common share equivalents of 2,923,829 and 2,804,287 were excluded from the determination of potentially dilutive shares for the three and six months ended December 31, 2008, respectively, due to their anti-dilutive effect. Common share equivalents of 742,671 and 758,974 were excluded from the determination of potentially dilutive shares for the three and six months ended December 31, 2007, respectively, due to their anti-dilutive effect.

The following table sets forth the computation of weighted-average shares used in computing basic and diluted net income per share:

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Weighted-average common shares outstanding - basic | 43,297,815 | 43,838,575 | 43,838,748 | 43,691,390 |
| Weighted-average common shares issuable upon exercise / vesting of outstanding share options/RSUs | 955,530 | 2,475,385 | 1,295,146 | 2,365,177 |
| Weighted-average common shares - diluted | 44,253,345 | 46,313,960 | 45,133,894 | 46,056,567 |

**Share-Based Compensation**

During the three and six months ended December 31, 2008, the Company recorded share-based compensation costs of $4,795 and $10,283, respectively. During the three and six months ended December 31, 2007, the Company recorded share-based compensation costs of $3,689 and $6,730, respectively. Share-based compensation costs capitalized as part of software and website

development costs were $279 and $514 for the three and six months ended December 31, 2008, respectively, and were $148 and $245 for the three and six months ended December 31, 2007, respectively.

7

Table of Contents

At December 31, 2008, there was $49,215 of total unrecognized compensation cost related to nonvested, share-based compensation arrangements. This cost is expected to be recognized over a weighted average period of 2.6 years.

**Income Taxes**

Effective July 1, 2007, the Company adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 48, Accounting for Uncertainty in Income Taxes ("FIN 48"), which prescribes how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return. As of June 30, 2008, the Company had unrecognized tax benefits, including interest and penalties, of approximately $877, which will reduce the effective tax rate when recognized. The Company recognizes interest and penalties related to unrecognized tax benefits in its provision for income taxes. There have been no significant changes to these amounts during the three and six months ended December 31, 2008.

The Company is required to file income tax returns in the U.S federal tax jurisdiction, the state of Massachusetts, and multiple jurisdictions outside of the U.S. Taxing authorities may challenge the Company's interpretation of tax law and additional tax may be assessed. The Company's U.S. tax returns for 2005 and subsequent years remain open to examination by the tax authorities. The Company's major non-U.S. tax jurisdictions are the Netherlands and Canada which have tax years open to examination for 2004 and forward. The statute of limitations is not closed for non-U.S. jurisdictions.

**New Accounting Pronouncements**

In December 2007, the FASB issued SFAS No. 141(R), Business Combinations ("SFAS 141(R)"). SFAS 141(R) states that all business combinations (whether full, partial or step acquisitions) will result in all assets and liabilities of an acquired business being recorded at their fair values. Certain forms of contingent consideration and certain acquired contingencies will also be recorded at fair value at the acquisition date. SFAS 141(R) also requires acquisition costs be expensed as incurred and restructuring costs will be expensed in periods after the acquisition date in accordance with the requirements of FASB Statement 146, Accounting for Costs of Exit or Disposal Activities. SFAS 141(R) is effective for financial statements issued for fiscal years beginning after December 15, 2008. Earlier adoption is prohibited. The Company does not believe that the adoption of this standard will have a material impact on its consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements-an amendment of Accounting Research Bulletin No. 51 ("SFAS 160"). SFAS 160 requires a company to clearly identify and present ownership interests in subsidiaries held by parties other than the company in the consolidated financial statements within the equity section but separate from the company's equity. It also requires the amount of consolidated net income attributable to the parent and to the noncontrolling interest be clearly identified and presented on the face of the consolidated statement of income; changes in ownership interest be accounted for similarly, as equity transactions; and when a subsidiary is deconsolidated, any retained noncontrolling equity investment in the former subsidiary and the gain or loss on the deconsolidation of the subsidiary be measured at fair value. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited. The Company does not believe that the adoption of this standard will have a material impact on its consolidated financial statements.

**3. Fair Value of Financial Instruments**

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"), which is effective for fiscal years beginning after November 15, 2007. The Company adopted SFAS No. 157 as of July 1, 2008. As permitted by FASB Staff Position ("FSP") No. SFAS 157-2, *Effective Date of FASB Statement No. 157* ("FSP No. SFAS 157-2"), the Company elected to defer the adoption of SFAS No. 157 for all non-financial assets and non-financial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis, until July 1, 2009. There was no cumulative effect of adoption related to SFAS No. 157 and the adoption did not have an impact on the Company's financial position, results of operations, or cash flows. The Company is studying SFAS No. 157 with respect to non-financial assets and non-financial liabilities falling under the scope of FSP No. 157-2 and has not yet determined the expected impact on the Company's financial position, results of operations, or cash flows.

SFAS No. 157 establishes a three-level valuation hierarchy for measuring fair value and expands financial statement disclosures about fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. The three levels are defined as follows:

- *Level 1* : Inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

8

Table of Contents

- *Level 2* : Inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- *Level 3* : Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The Company measures the following financial assets at fair value on a recurring basis.

The fair value of these financial assets was determined using the following inputs at December 31, 2008 (unaudited, in thousands):

| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Cash and cash equivalents | $ 97,892 | $ 97,892 | $ — | $ — |
| Short-term investments (1) | 13,123 | 13,123 | — | — |
| Long-term investments (2) | 760 | — | — | 760 |
|    Total assets recorded at fair value | $ 111,775 | $ 111,015 | $ — | $ 760 |

(1)    Short-term investments consist primarily of U.S. Treasury Bills, corporate bonds and U.S. government agency issues for which the Company determines fair value through quoted market prices.
(2)    Long-term investments consist of an auction rate security.

The Company has the intent and the ability to hold the Level 3 asset until the anticipated recovery period which it believes will be more than twelve months. To reflect the change in fair value of the investment security, the Company recorded an impairment charge through other comprehensive income during fiscal 2008. For the three and six months ended December 31, 2008 there have been no changes in the fair value of our assets being measured using significant unobservable inputs (Level 3) as defined in SFAS 157.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities Including an amendment of FASB Statement No. 115* ("SFAS No. 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value and is effective for fiscal years beginning after November 15, 2007. The Company has elected not to apply the fair value option to any of its assets or liabilities.

**4. Comprehensive Income**

Comprehensive income is composed of net income, unrealized gains and losses on marketable securities and cumulative foreign currency translation adjustments. The following table displays the computation of comprehensive income (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Net income | $18,549 | $11,169 | $26,823 | $18,049 |
| Unrealized gain on marketable securities | 181 | 2 | 44 | 3 |
| Change in cumulative foreign currency translation adjustments | (508) | 1,431 | (5,146) | 3,289 |
|    Comprehensive income | $18,222 | $12,602 | $21,721 | $21,341 |

**5. Segment Information**

SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*, establishes standards for reporting information regarding operating segments in annual financial statements and requires selected information of those segments to be presented in interim financial reports issued to shareholders. Operating segments are identified as components of an enterprise about which separate discrete financial information is available for evaluation by the chief operating decision-maker, or decision-making group, in making decisions on how to allocate resources and assess performance. The Company's chief operating decision maker is considered to be the team comprised of the chief executive officer and the executive management team. The Company views its operations and manages its business as one operating segment.

9

Table of Contents

*Geographic Data*

Revenues by geography are based on the country-specific website through which the customer's order was transacted. The following table sets forth revenues and long-lived assets by geographic area (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
| | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|
| Revenues: | | | | |
| United States | $ 80,331 | $ 63,809 | $ 151,193 | $ 116,443 |
| Non-United States | 58,572 | 41,208 | 101,942 | 68,027 |
| Total revenues | $ 138,903 | $ 105,017 | $ 253,135 | $ 184,470 |

| | December 31, 2008 | June 30, 2008 |
|---|---|---|
| Long-lived assets: | | |
| Bermuda | $ 17,069 | $ 14,681 |
| Netherlands | 68,815 | 67,153 |
| Switzerland | 1,669 | 1,622 |
| Canada | 88,774 | 71,485 |
| United States | 12,806 | 13,747 |
| Jamaica | 2,409 | 1,150 |
| Spain | 1,707 | 2,040 |
| Total long-lived assets | $ 193,249 | $ 171,878 |

## 6. Commitments and Contingencies

*Purchase Commitments*

At December 31, 2008, the Company had unrecorded commitments under contracts to purchase production equipment of approximately $3,220 and to complete the expansion of production and service facilities of approximately $14,337.

*Legal Proceedings*

On July 27, 2006, the Company's wholly-owned subsidiary VistaPrint Technologies Limited filed a patent infringement lawsuit against print24 GmbH, unitedprint.com AG and their two managing directors in the District Court in Düsseldorf Germany, alleging infringement by the defendants in Germany of one of VistaPrint's European patents related to computer-implemented methods and apparatus for generating pre-press graphic files. On June 7, 2007, unitedprint.com AG filed a patent nullification action in the German Patent Court in relation to the same European patent at issue in VistaPrint's infringement lawsuit against print24 and its co-defendants. On July 31, 2007, the District Court in Düsseldorf ruled in VistaPrint's favor on the underlying infringement claim against print24 and its co-defendants, granting all elements of the requested injunction and ordering the defendants to pay damages for past infringement. The Düsseldorf District Court's ruling went into effect in early September 2007 and was not appealed by the defendants. On November 13, 2008, the German Patent Court held an oral hearing on the patent nullification action brought by unitedprint.com and revoked the patent at issue. The Patent Court indicated that it will prepare a written opinion stating the basis for its ruling, following which VistaPrint may choose to appeal the Patent Court's ruling to the German Supreme Court. We are unable to express an opinion as to the likely outcome of any such appeal.

On May 14, 2007, VistaPrint Technologies Limited filed a patent infringement lawsuit against 123Print, Inc. and Drawing Board (US), Inc., subsidiaries of Taylor Corporation, in the United States District Court for the District of Minnesota. The complaint in the lawsuit asserts that the defendants have infringed and continue to infringe three U.S. patents owned by VistaPrint Technologies Limited related to browser-based tools for online product design. The complaint seeks an injunction against the defendants and the recovery of damages. The defendants filed their Answer and Counterclaims to the complaint on June 7, 2007, in which they denied the infringement allegations and asserted counterclaims for declaratory judgment of invalidity, unenforceability and non-infringement of the patents-in-suit. In August 2007, another Taylor Corporation subsidiary, Taylor Strategic Accounts, Inc., was added as an additional defendant in the case. The exchange of relevant documents and records and the depositions of fact witnesses in connection with the allegations of the parties have been substantially completed. In early June 2008, newly discovered third party art documents were introduced into the litigation. These documents had not been reviewed and considered by the U.S. Patent Office prior to issuance of the patents-in-suit. For that reason, on June 30, 2008, VistaPrint Technologies Limited requested the United States District Court to stay the litigation to provide the U.S. Patent Office an opportunity to reexamine the patents-in-suit in light of these newly discovered documents. The defendants opposed VistaPrint Technologies Limited's request for a stay. On September 2, 2008,

Table of Contents

the Court granted VistaPrint Technologies Limited's request for a stay. Subsequent to the Court's decision, VistaPrint Technologies Limited submitted a request for reexamination of each of the patents-in-suit to the U.S. Patent Office. Pursuant to the Court's order, the stay will remain in place pending the resolution of the requests for reexamination. On October 28, 2008, a St. Paul, Minnesota law firm also filed requests with the U.S. Patent Office seeking reexamination of two of the three patents-in-suit. The name of the client who engaged the firm to prepare and file the reexamination requests was not disclosed by the firm, but the Company believes that the client was either Taylor Corporation or an affiliate of Taylor Corporation. The Company is unable to express an opinion as to the likely outcome of any such reexamination.

On July 29, 2008, a purported class action lawsuit was filed in the United States District Court for the Southern District of Texas (the "Texas Complaint") against VistaPrint Corp., VistaPrint USA, Inc., Vertrue, Inc. and Adaptive Marketing, LLC (collectively, the "Defendants"). Adaptive Marketing, LLC is a Vertrue, Inc. company that provides subscription-based membership discount programs, including programs that are offered on our VistaPrint.com website (Vertrue, Inc. and Adaptive Marketing, LLC are sometimes collectively referred to herein as the "Vertrue Defendants"). The Texas Complaint alleges that the Defendants violated, among other statutes, the Electronic Funds Transfer Act, the Electronic Communications Privacy Act, the Texas Deceptive Trade Practices-Consumer Protection Act and the Texas Theft Liability Act, in connection with certain membership discount programs offered to VistaPrint customers on our VistaPrint.com website. The Texas Complaint also seeks recovery for unjust enrichment, conversion, and similar common law claims. Subsequent to the filing of the Texas complaint, on July 31, 2008, August 25, 2008, September 3, 2008, September 10, 2008 and September 11, 2008, nearly identical purported class action lawsuits were filed in the United States District Court, District of New Jersey, the United States District Court, Southern District of Alabama, the United States District Court, District of Nevada, the United States District Court, District of Massachusetts, and the United States District Court, District of Florida, respectively, against the same Defendants, and in one case VistaPrint Ltd., on behalf of different plaintiffs. The complaints in each of these nearly identical lawsuits include substantially the same purported Federal and common law claims as the Texas Complaint but contain different state law claims. In addition, on August 28, 2008, a purported class action lawsuit asserting substantially the same Federal and common law claims as the Texas Complaint, but containing a state law claim under the Massachusetts Unfair Trade Practices Act, was filed by a different plaintiff in the United States District Court, District of Massachusetts, against VistaPrint Ltd., VistaPrint USA, Inc. and the Vertrue Defendants.

Among other allegations, the plaintiffs in each action claim that after ordering products on our VistaPrint.com website they were enrolled in certain membership discount programs operated by the Vertrue Defendants and that monthly subscription fees for the programs were subsequently charged directly to the credit or debit cards they used to make purchases on VistaPrint.com, in each case purportedly without their knowledge or authorization. The plaintiffs also claim that the Defendants failed to disclose to them that the credit or debit card information they provided to make purchases on VistaPrint.com would be disclosed to the Vertrue Defendants and would be used to pay for monthly subscriptions for the membership discount programs. The plaintiffs have requested that the Defendants be enjoined from engaging in the practices complained of by the plaintiffs. They also are seeking an unspecified amount of damages, including statutory and punitive damages, as well as pre-judgment and post-judgment interest and attorneys' fees and costs for the purported class.

On September 8, 2008, VistaPrint USA, Incorporated filed an Answer to the Texas Complaint in the United States District Court for the Southern District of Texas, and on September 9, 2008, VistaPrint USA, Incorporated filed a Motion to Dismiss for Improper Venue in the United States District Court for the Southern District of Texas. Subsequently, on or about September 16, 2008, the plaintiff in one of the cases pending before the United States District Court for the District of Massachusetts filed a Motion before the Judicial Panel on Multidistrict Litigation seeking the consolidation and transfer of pretrial proceedings in all of the outstanding cases to the Massachusetts District Court. Following that, on or about September 24, 2008 and September 25, 2008, the Vertrue Defendants and VistaPrint USA, Incorporated and VistaPrint Limited, respectively, filed motions before the Judicial Panel on Multidistrict Litigation to transfer all of the outstanding cases, as well as any cases subsequently filed involving similar facts or claims, to the United States District Court for the Southern District of Texas for coordinated pretrial proceedings. All of the purported class action lawsuits in which the Defendants have been served were subsequently stayed pending resolution of the motions for consolidation and transfer pending before the Judicial Panel on Multidistrict Litigation. On December 11, 2008, the Judicial Panel on Multidistrict Litigation ruled in favor of the motions brought by the Vertrue Defendants, VistaPrint USA, Incorporated and VistaPrint Limited and ordered the transfer of all of the outstanding cases to the United States District Court for the Southern District of Texas for coordinated pretrial proceedings.

The Company believes it has meritorious defenses to these purported class action lawsuits and intends to defend these actions vigorously. However, the lawsuits are in their earliest stages and the Company is unable to express an opinion as to the likely outcome of such actions.

The Company is not currently party to any other material legal proceedings. The Company is involved, from time to time, in various legal proceedings arising from the normal course of business activities. Although the results of litigation and claims cannot be predicted with certainty, the Company does not expect resolution of these matters to have a material adverse impact on its consolidated results of operations, cash flows or financial position. However, an unfavorable resolution of such a proceeding could,

depending on its amount and timing, materially affect the Company's results of operations, cash flows or financial position in a future period. Regardless of the outcome, litigation can have an adverse impact on the Company because of defense costs, diversion of management resources and other factors.

11

Table of Contents

**ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*This Quarterly Report on Form 10-Q contains forward-looking statements that involve risks and uncertainties. The statements contained in this Quarterly Report on Form 10-Q that are not purely historical are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Without limiting the foregoing, the words "may," "will," "should," "could," "expects," "plans," "intends," "anticipates," "believes," "estimates," "predicts," "potential," "continue," "target," "seek" and similar expressions are intended to identify forward-looking statements. All forward-looking statements included in this Quarterly Report on Form 10-Q are based on information available to us up to, and including the date of this document, and we disclaim any obligation to update any such forward-looking statements. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain important factors, including those set forth in this "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q. You should carefully review those factors and also carefully review the risks outlined in other documents that we file from time to time with the United States Securities and Exchange Commission.*

## Overview

We are a small business marketing company that offers small businesses the ability to market their business with a broad range of brand identity and promotional products, marketing services and electronic solutions. We offer a broad spectrum of products and services ranging from business cards, website hosting, brochures and invitations to mailing and creative services. We seek to offer compelling value to our customers through an innovative use of technology, a broad selection of customized products and services, low pricing and personalized customer service. Through our use of proprietary Internet-based graphic design software, localized websites, proprietary order receiving and processing technologies and advanced computer integrated production facilities; we offer a meaningful economic advantage relative to traditional graphic design and printing methods. Our value proposition has allowed us to successfully penetrate the large, fragmented and geographically dispersed small business and consumer markets.

We maintain a registered office in Hamilton, Bermuda and our websites are hosted in co-location facilities in Devonshire, Bermuda. We own and operate production facilities near Windsor, Ontario, Canada and in Venlo, the Netherlands, and we operate a customer design, sales and service center in Montego Bay, Jamaica, a European marketing office in Barcelona, Spain, and a technology development facility in Winterthur, Switzerland. Our European headquarters are located in Barcelona, Spain. Our U.S. technology development, marketing, finance and administrative offices are located in Lexington, Massachusetts, United States.

*Revenue* . For the three and six months ended December 31, 2008, our revenue was $138.9 million and $253.1 million, compared to $105.0 million and $184.5 million for the same periods in 2007. We generate revenue primarily from the printing and shipment of customized products. Revenue is recorded net of a reserve for estimated refunds. Customers place orders via our websites and pay primarily using credit cards. In addition, we receive payment for some orders through direct bank debit, wire transfers and other payment methods. We also generate revenue from order referral fees, revenue share and other fees paid to us by merchants for customer click-throughs, distribution of third-party promotional materials and referrals arising from products and services of the merchants we offer to our customers on our website, as well as certain electronic products such as website hosting. Unlike products that we manufacture ourselves, these third-party referral offerings do not require physical production by us and have minimal corresponding direct cost of revenue. For the three and six months ended December 31, 2008, we generated approximately $6.4 million and $13.4 million of our revenue from these third-party referral fees, compared to $6.6 million and $13.4 million for the same periods in 2007. A portion of our revenue is derived from repeat purchases from our existing customers. This component of our revenue was 65% and 66% of revenue for the three and six months ended December 31, 2008. To understand our revenue trends, we monitor several key metrics, including:

- *Website sessions* . A session is measured each time a computer user visits a VistaPrint website from their Internet browser. We measure this data to understand the volume and source of traffic to our websites. Typically, we use various advertising campaigns to increase the number and quality of shoppers entering our websites. The number of website sessions varies from month to month depending on variables such as product campaigns and advertising channels used.

- *Conversion rates* . The conversion rate is the number of customer orders divided by the total number of sessions during a specific period of time. We strive to increase conversion rates of customers entering our websites in order to increase the number of customer orders generated. Conversion rates have fluctuated in the past and we anticipate that they will fluctuate in the future due to, among other factors, the type of advertising campaigns and marketing channels used.

- *Average order value* . Average order value is total bookings for a given period of time divided by the total number of customer orders recorded during that same period of time. We seek to increase average order value as a means of increasing total revenue. Average order values have fluctuated in the past and we anticipate that they will fluctuate in the future depending upon, among other things, the type of products promoted during a period and promotional discounts

offered. For example, seasonal product offerings, such as holiday cards, can cause changes in average order values.

12

Table of Contents

We believe the analysis of these metrics provides us with important information on customer buying behavior, advertising campaign effectiveness and the resulting impact on overall revenue trends and profitability. While we continually seek and test ways to increase revenue, we also attempt to increase the number of customer acquisitions and to grow profits. As a result, fluctuations in these metrics are usual and expected. Because changes in any one of these metrics may be offset by changes in another metric, no single factor is determinative of our revenue and profitability trends and we assess them together to understand their overall impact on revenue and profitability.

*Cost of Revenue* . Cost of revenue consists of materials used to generate products, payroll and related expenses for production personnel, supplies, depreciation of equipment used in the production process, shipping charges and other miscellaneous related costs of products sold by us.

*Technology and development expense* . Technology and development expense consists primarily of payroll and related expenses for software and content development, amortization of capitalized software and website development costs, information technology operations, website hosting, equipment depreciation, patent amortization and miscellaneous technology infrastructure-related costs. Costs associated with the development of software for internal-use are capitalized if the software is expected to have a useful life beyond one year and are amortized over the software's useful life, which is estimated to be two years. Costs associated with preliminary stage software development, repair, maintenance or the development of website content are expensed as incurred. These expenses also include amortization of capitalized purchase costs related to content images used in our graphic design software which are capitalized and amortized over their useful lives, which approximate two years.

*Marketing and selling expense* . Marketing and selling expense consists of advertising and promotional costs as well as wages and related payroll benefits for our employees engaged in sales, marketing and public relations activities. Advertising costs consist of various online and print media, such as the purchase of key word search terms, e-mail and direct mail promotions and various strategic alliances. Our advertising efforts target the acquisition of new customers and repeat orders from existing customers. Advertising costs are expensed as incurred. Marketing and selling expense also includes the salaries and related payroll benefits, overhead, and outside services related to our customer design sales and services support center operations and global partnerships personnel. The customer support center provides phone support to customers on various topics such as order status, the use of our website graphic design studio, and free real-time design assistance. Marketing and selling expense also includes third party payment processor and credit card fees.

*General and administrative expense* . General and administrative expense consists of general corporate costs, including salary and related payroll benefit expenses of employees involved in finance, accounting, human resources and general executive management. We have incurred and will incur additional legal and accounting costs in order to comply with regulatory reporting requirements, as well as additional costs associated with being a publicly traded company, such as investor relations and higher insurance premiums.

*Interest income* . Interest income consists of interest income earned on cash and cash equivalents and marketable securities.

*Other income (expense), net* . Other income (expense), net primarily consists of gains and losses from foreign currency transactions.

*Interest expense* . Interest expense consists of interest paid to financial institutions on outstanding balances on our credit facilities.

*Income taxes* . VistaPrint Limited is a Bermuda based company. Bermuda does not currently impose any tax computed on profits or income, which results in a zero tax liability for our profits recorded in Bermuda. VistaPrint Limited has operating subsidiaries in the Netherlands, Canada, Jamaica, Spain, Switzerland and the United States. VistaPrint Limited has entered into service and related agreements, which we also refer to as transfer pricing agreements, with each of these operating subsidiaries. These agreements effectively result in VistaPrint Limited paying each of these subsidiaries for its costs plus a fixed mark-up on these costs. The Jamaican subsidiary is located in a tax free zone, so its tax rate is zero. Our Dutch, Canadian, Spanish, Swiss and American subsidiaries are each located in jurisdictions that tax profits and, accordingly, regardless of our consolidated results of operations, these subsidiaries will each pay taxes in their respective jurisdictions.

13

Table of Contents

## Results of Operations

The following table presents our historical operating results for the periods indicated as a percentage of revenue:

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| **Consolidated Statement of Operations Data:** | | | | |
| **As a percentage of revenue:** | | | | |
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of revenue | 36.5% | 38.0% | 37.7% | 37.8% |
| Technology and development expense | 11.0% | 10.6% | 11.5% | 11.0% |
| Marketing and selling expense | 30.7% | 32.5% | 30.6% | 32.8% |
| General and administrative expense | 6.9% | 7.7% | 8.2% | 8.4% |
| Income from operations | 14.9% | 11.2% | 12.0% | 10.1% |
| Interest income | 0.4% | 1.1% | 0.5% | 1.3% |
| Other income (expense), net | (0.3)% | 0.1% | (0.5)% | 0.1% |
| Interest expense | 0.3% | 0.4% | 0.3% | 0.5% |
| Income from operations before income taxes | 14.7% | 12.0% | 11.7% | 11.0% |
| Income tax provision | 1.3% | 1.4% | 1.1% | 1.2% |
| Net income | 13.4% | 10.6% | 10.6% | 9.8% |

### Comparison of the Three and Six Month Periods Ended December 31, 2008 and 2007:

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| *In thousands* | 2008 | 2007 | 2008-2007 % Change | 2008 | 2007 | 2008-2007 % Change |
| Revenue | $138,903 | $105,017 | 32% | $253,135 | $184,470 | 37% |
| Cost of revenue | $ 50,692 | $ 39,896 | 27% | $ 95,536 | $ 69,648 | 37% |
| *% of revenue* | *36.5%* | *38.0%* | | *37.7%* | *37.8%* | |

The increase in revenue from the three and six months ended December 31, 2007 as compared to the three and six months ended December 31, 2008 was primarily attributable to increases in website sales of our products. These increases include a favorable seasonal impact from increased holiday product sales. The overall revenue growth during this period was driven by an increase in website sessions and conversion rates and a positive impact from new product and service offerings. For the three and six months ended December 31, 2008, our website sessions grew by 16% and 11% to 61.4 million and 108.0 million. Our conversion rates increased to 6.5% and 6.7% for the three and six months ended December 31, 2008 compared to a constant 5.4% for the same periods in 2007. For the three and six months ended December 31, 2008, the average order value of our shipments was constant at $34, compared to $36 and $34 for the same periods in 2007. Revenue from repeat customers increased to 65% of revenue for the three months ended December 31, 2008 compared to 63% for the same period in 2007. Revenue from repeat customers increased to 66% of revenue for the six months ended December 31, 2008 compared to 64% for the same period in 2007. Revenue from our non-United States websites accounted for 42% and 40% of total revenue for the three and six months ended December 31, 2008 compared to 39% and 37% for the same periods in 2007. The increase in cost of revenue for the three and six months ended December 31, 2008 as compared to the three and six months ended December 31, 2007 was primarily attributable to the production costs associated with increased volume of shipments of products during these periods. The decrease in the cost of revenue as a percentage of total revenue for the three and six months ended December 31, 2008 as compared to the same periods in the prior year was primarily driven by a shift in our overall product mix, improved pricing agreements in relation to material costs and productivity improvements at our manufacturing locations.

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| *In thousands* | 2008 | 2007 | 2008-2007 % Change | 2008 | 2007 | 2008-2007 % Change |
| **Technology and development expense** | $15,246 | $11,124 | 37% | $29,054 | $20,232 | 44% |
| *% of revenue* | *11.0%* | *10.6%* | | *11.5%* | *11.0%* | |
| **Marketing and selling expense** | $42,683 | $34,123 | 25% | $77,484 | $60,439 | 28% |
| *% of revenue* | *30.7%* | *32.5%* | | *30.6%* | *32.8%* | |
| **General and administrative expense** | $ 9,629 | $ 8,076 | 19% | $20,576 | $15,445 | 33% |
| *% of revenue* | *6.9%* | *7.7%* | | *8.2%* | *8.4%* | |

Table of Contents

The increase in our technology and development expenses of $4.1 million and $8.8 million for the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007 was primarily due to increased payroll and benefit costs of $2.0 million and $4.6 million, the write-off of certain long lived assets of $0.7 million and $0.7 million and increased share-based compensation costs of $0.2 million and $0.7 million associated with increased employee hiring in our technology development and information technology support organizations. At December 31, 2008, we employed 290 employees in these organizations compared to 213 employees at December 31, 2007. The increase in headcount has resulted in an overall increase in overhead of $0.4 million and $0.7 million for the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007. In addition, to support our continued revenue growth during this period, we continued to invest in our website infrastructure, which resulted in increased depreciation expenses of $0.5 million and $1.0 million for the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007.

The increase in our marketing and selling expenses of $8.6 million and $17.0 million for the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007 was driven primarily by increases of $6.8 million and $11.9 million in advertising costs related to new customer acquisition and costs of promotions targeted at our existing customer base, increases in payroll and benefits related costs of $1.2 million and $3.2 million and share-based compensation costs which remained constant for the three months ended December 31, 2008 and increased $0.2 million for the six months ended December 31, 2008. During this period, we continued to expand our marketing organization and our design, sales and services center. At December 31, 2008, we employed 622 employees in these organizations compared to 511 employees at December 31, 2007. In addition, payment processing fees paid to third-parties increased by $0.9 million and $1.8 million during the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007 due primarily to increased order volumes.

The increase in our general and administrative expenses of $1.6 million and $5.1 million for the three and six months ended December 31, 2008, respectively, as compared to the same periods in 2007 was primarily due to increased payroll and benefit costs of $0.4 million and $2.0 million and increased share-based compensation costs of $1.0 million and $2.7 million resulting from the continued growth of our executive management, finance and human resource organizations. At December 31, 2008, we employed 135 employees in these organizations compared to 111 employees at December 31, 2007.

*Interest income*

Interest income decreased $0.6 million and $1.0 million the three and six months ended December 31, 2008 to $0.6 million and $1.3 million compared to the same periods in 2007. The decrease in interest income for the three and six months ended December 31, 2008 was primarily due to lower interest rate yields on invested cash and marketable securities.

*Other income (expense), net*

Other income (expense), net changed to $0.4 million and $1.4 million of expense for the three and six months ended December 31, 2008 as compared to $0.1 million and $0.1 million of income for the same period in 2007. The change for the three and six months ended December 31, 2008, as compared to the same periods in 2007 consists primarily of incurred net losses from foreign currency transactions.

*Interest expense*

Interest expense decreased approximately $0.1 million for the three and six months ended December 31, 2008 to approximately $0.4 million and $0.7 million as compared to approximately $0.4 million and $0.9 million for the same periods in 2007 due to a decrease in the outstanding principal on our bank loan obligations during these periods.

*Income tax provision*

|  | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| *In thousands* | 2008 | 2007 | 2008 | 2007 |
| **Income taxes:** | | | | |
| **Income tax provision** | $ 1,889 | $ 1,455 | $2,854 | $2,220 |
| *Effective tax rate* | *9.2%* | *11.5%* | *9.6%* | *11.0%* |

For the three and six months ended December 31, 2008 and 2007, our tax expense primarily consisted of tax provisions for our subsidiaries in the United States, the Netherlands, Canada, Switzerland and Spain. The taxable income from these operating subsidiaries is a function of their level of costs incurred and charged to VistaPrint Limited under transfer pricing agreements. The resulting tax liability in each jurisdiction is incurred regardless of whether the consolidated group is profitable. The decrease in the effective tax rate in 2008 compared to 2007 is primarily due to the positive impact of U.S. Research and Development credits, which were retroactively re-instated in October 2008.

15

Table of Contents

**Liquidity and Capital Resources**

*Consolidated Statements of Cash Flows Data:*

|  | Six Months Ended December 31, | |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Capital expenditures | $(41,500) | $(34,692) |
| Software and website development costs | (3,327) | (2,155) |
| Depreciation and amortization | 16,646 | 11,068 |
| Cash flows provided by operating activities | 72,704 | 52,030 |
| Cash flows used in investing activities | (32,068) | (34,470) |
| Cash flows (used in) provided by from financing activities | (45,234) | 2,628 |

At December 31, 2008, we had $111.0 million of cash, cash equivalents and marketable securities. Cash equivalents and marketable securities are comprised of money market funds, U.S. Treasury Bills, investment-grade corporate bonds and U.S. government agency issues. We financed our operations through internally generated cash flows from operations. We believe that our available cash and cash flows generated from operations will be sufficient to satisfy our working capital, long-term debt and capital expenditure requirements for the foreseeable future.

*Operating Activities .* Cash provided by operating activities in the six months ended December 31, 2008 was $72.7 million and consisted of net income of $26.8 million, positive adjustments for non-cash items of $28.3 million and $17.6 million provided by working capital and other activities. Adjustments for non-cash items included $16.7 million of depreciation and amortization expense on property and equipment and software and website development costs, $10.3 million of share-based compensation expense and $1.3 million of long-lived assets written off. The change in working capital and other activities primarily consisted of an increase of $16.4 million in accrued expenses and other current liabilities, an increase of $3.8 million in accounts payable and a decrease of $1.0 million in accounts receivable, offset by an increase of $2.0 million in prepaid expenses and other assets and an increase in inventory of $1.6 million.

Cash provided by operating activities in the six months ended December 31, 2007 was $52.0 million and consisted of net income of $18.0 million, positive adjustments for non-cash items of $17.9 million and $16.1 million provided by working capital and other activities. Adjustments for non-cash items included $11.1 million of depreciation and amortization expense on property and equipment and software and website development costs and $6.7 million of share-based compensation expense. The change in working capital and other activities primarily consisted of an increase of $13.6 million in accrued expenses and other current liabilities, an increase of $5.4 million in accounts payable and a decrease of $1.4 million in accounts receivable offset by an increase of $3.1 million in prepaid expenses and other assets and an increase in inventory of $1.2 million.

*Investing Activities.* Cash used in investing activities in the six months ended December 31, 2008 of $32.1 million was attributable primarily to capital expenditures of $41.5 million, capitalized software and website development costs of $3.3 million partially offset by net sales of marketable securities of $12.8 million. Capital expenditures of $18.1 million were related to the purchase of equipment for our production facilities, $17.2 million were related to construction and land acquisition costs at our production facilities and $6.2 million were related to purchases of information technology and facility related assets.

Cash used in investing activities in the six months ended December 31, 2007 of $34.5 million was attributable primarily to capital expenditures of $34.7 million, acquisition of intangible assets representing the purchase of the vista.com domain name of $1.2 million, and capitalized software and website development costs of $2.2 million, partially offset by net sales of marketable securities of $3.6 million. Capital expenditures of $16.1 million were related to the purchase of equipment for our production facilities, $12.0 million were related to construction and land acquisition costs at our production facilities and $6.6 million were related to purchases of information technology and facility related assets.

*Financing Activities.* Cash used by financing activities in the six months ended December 31, 2008 of $45.2 million was primarily attributable to the repurchase of 2,554,302 common shares for $45.5 million, payments in connection with our bank loans of $1.6 million associated with the purchase of production assets for our facilities and the use of $1.4 million to pay minimum withholding taxes related to the vesting of restricted share units (RSUs) granted and common shares withheld under our equity incentive plans, partially offset by the issuance of common shares pursuant to share option exercises of $3.3 million. Effective November 9, 2008 VistaPrint's shareholders approved our ability to hold treasury shares. The repurchases of shares made by us prior to November 9, 2008 are treated as retired shares and repurchases after this date are presented as treasury shares.

On August 12, 2008, we had announced that our Board of Directors authorized our repurchase of up to an aggregate of $50.0 million of our common shares from time to time on the open market. As of December 31, 2008 we had $4.5 million remaining under this approved repurchase program. The share repurchase authorization expires on February 8, 2010, but may be suspended or

Case4:08-cv-05261-SBA   Document21-2    Filed03/13/09   Page24 of 58

discontinued by us at any time.

16

Table of Contents

Cash provided by financing activities in the six months ended December 31, 2007 of $2.6 million was primarily attributable to the issuance of common shares pursuant to share option exercises of $5.8 million, partially offset by payments in connection with our bank loans of $1.6 million associated with the purchase of assets for our production facilities and the use of $1.6 million to pay minimum withholding taxes related to the vesting of RSUs granted and common shares withheld under our equity incentive plans.

## Contractual Obligations

Contractual obligations at December 31, 2008 were as follows:

| | | Payments Due by Period | | | |
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Long-term debt obligations (excluding interest) | $20,409 | $ 8,977 | $ 6,945 | $ 704 | $ 3,783 |
| Operating lease obligations | 50,543 | 6,078 | 12,166 | 11,745 | 20,554 |
| Total | $70,952 | $15,055 | $19,111 | $12,449 | $24,337 |

*Long-Term Debt.* In November 2003, VistaPrint B.V., our Dutch subsidiary, entered into a 5.0 million euro revolving credit agreement with ABN AMRO Bank N.V., a Netherlands-based bank. The borrowings were used to finance the construction of our production facility located in Venlo, the Netherlands. The loan is secured by a mortgage on the land and building and is payable in quarterly installments of 62,500 euros ($88,000 at December 31, 2008), beginning October 1, 2004 and continuing through 2024. On April 1, 2006, we elected a fixed rate option and the interest rate was fixed at 5.20% through April 1, 2016 at which time the rate will be reset. At December 31, 2008, there was $5.5 million outstanding under this credit agreement.

In November 2004, VistaPrint B.V. amended the existing credit agreement with ABN AMRO to include an additional 1.2 million euro loan. The borrowings were used to finance a new printing press for the Venlo production facility. The loan is secured by the printing press and is payable in quarterly installments of 50,000 euros ($70,000 at December 31, 2008), beginning on April 1, 2005 and continuing through 2011. On April 1, 2006, we elected a fixed rate option and the interest rate was fixed at 5.10% over the remaining term of the loan. At December 31, 2008, there was $0.6 million outstanding under this amendment to the credit agreement.

In November 2004, VistaPrint North American Services Corp., our Canadian production subsidiary, established an $11.0 million credit facility with Comerica Bank—Canada. The borrowings were used to finance new equipment purchases and the construction of our production facility located in Windsor, Ontario, Canada. The loan is secured by guarantees from VistaPrint Limited and two of our subsidiaries and is payable in monthly installments, plus interest, beginning on November 1, 2005 and continuing through 2009. On December 1, 2005, the interest rates for the equipment term loan and the construction loan were fixed at 6.47% and 6.37%, respectively, over the remaining terms of the loans. At December 31, 2008, there was $7.0 million outstanding under this credit facility.

In December 2005, VistaPrint North American Services Corp. amended its existing credit agreement with Comerica Bank to include an additional $10.0 million equipment term loan. The borrowings have been used to finance new equipment purchases for the Windsor production facility. The loan is secured by guarantees from VistaPrint Limited and two of our subsidiaries and is payable in monthly installments, plus interest, beginning on December 1, 2006 and continuing through 2010. As of March 31, 2006, the interest rates on the various borrowings under this term loan had been fixed over the remaining term of the loan at rates ranging from 7.82% to 8.50%. At December 31, 2008, there was $7.2 million outstanding under this term loan.

*Operating Leases.* We rent office space under operating leases expiring on various dates through 2017. We recognize rent expense on our operating leases that include free rent periods and scheduled rent payments on a straight-line basis from the commencement of the lease.

*Purchase Commitments.* At December 31, 2008, we had unrecorded commitments under contracts to purchase production equipment and to complete construction related to the expansion of our production and service facilities of approximately $17.6 million compared to approximately $21.9 million at June 30, 2008. Additionally, as of January 26, 2009, we entered into a contract to purchase land and facilities of approximately $5.3 million.

## Recent Accounting Pronouncements

In December 2007, the FASB issued SFAS No. 141(R) Business Combinations ("SFAS 141(R)"). SFAS 141(R) states that all business combinations (whether full, partial or step acquisitions) will result in all assets and liabilities of an acquired business being recorded at their fair values. Certain forms of contingent consideration and certain acquired contingencies will also be recorded at

fair value at the acquisition date. SFAS 141(R) also requires acquisition costs be expensed as incurred and restructuring costs will be expensed in periods after the acquisition date in accordance with the requirements of FASB Statement 146, Accounting for Costs of

17

Table of Contents

Exit or Disposal Activities. SFAS 141(R) is effective for financial statements issued for fiscal years beginning after December 15, 2008. Earlier adoption is prohibited. We do not believe that the adoption of this standard will have a material impact on our consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements-an amendment of Accounting Research Bulletin No. 51 ("SFAS 160"). SFAS 160 requires a company to clearly identify and present ownership interests in subsidiaries held by parties other than the company in the consolidated financial statements within the equity section but separate from the company's equity. It also requires the amount of consolidated net income attributable to the parent and to the noncontrolling interest be clearly identified and presented on the face of the consolidated statement of income; changes in ownership interest be accounted for similarly, as equity transactions; and when a subsidiary is deconsolidated, any retained noncontrolling equity investment in the former subsidiary and the gain or loss on the deconsolidation of the subsidiary be measured at fair value. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited. We do not believe that the adoption of this standard will have a material impact on our consolidated financial statements.

### Critical Accounting Policies and Estimates

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States. To apply these principles, we must make estimates and judgments that affect our reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. In many instances, we reasonably could have used different accounting estimates and, in other instances, changes in the accounting estimates are reasonably likely to occur from period to period. Accordingly, actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our financial condition or results of operations will be affected. We base our estimates and judgments on historical experience and other assumptions that we believe to be reasonable at the time and under the circumstances, and we evaluate these estimates and judgments on an ongoing basis. We refer to accounting estimates and judgments of this type as critical accounting policies and estimates. Management believes there have been no material changes during the three months ended December 31, 2008 to the critical accounting policies reported in the Management's Discussion and Analysis of Financial Condition and Results of Operations section of our Annual Report on Form 10-K filed with the Securities and Exchange Commission on August 29, 2008.

### ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Interest Rate Risk.* Our exposure to interest rate risk relates primarily to our cash and cash equivalents and short term investments. At December 31, 2008, we had unrestricted cash and cash equivalents totaling $97.9 million and short-term investments totaling $13.1 million. These amounts were invested primarily in money market funds, U.S. Treasury bills, investment-grade corporate bonds and U.S. government agency issues, and are held for working capital purposes. We do not enter into investments for trading or speculative purposes. We considered the historical volatility of short term interest rates and determined that it was reasonably possible that an adverse change of 100 basis points could be experienced in the near term. A hypothetical 1% (100 basis-point) increase in interest rates would have resulted in an immaterial decrease in the fair values of our marketable securities at December 31, 2008 and 2007.

*Foreign Currency Risk.* As we conduct business in multiple international currencies through our worldwide operations, we are affected by fluctuations in foreign exchange rates of such currencies. Fluctuations in exchange rates can positively or negatively affect our revenue, gross margins and retained earnings. The majority of our products sold outside North America are manufactured by our Dutch subsidiary, which has the euro as its functional currency. Our Spanish subsidiary, which operates a marketing office in Barcelona, Spain, also has the euro as its functional currency. Our Swiss subsidiary, which operates a technology and development facility in Winterthur, Switzerland, has the Swiss franc as its functional currency. Our Dutch, Spanish and Swiss subsidiaries translate their assets and liabilities at current rates of exchange in effect at the balance sheet date. The resulting gains and losses from translation are included as a component of accumulated other comprehensive income. All other subsidiaries have the United States dollar as the functional currency and transaction gains and losses and remeasurement of assets and liabilities denominated in currencies other than the U.S. dollar are included in other income (expense), net. In addition, our subsidiaries have intercompany accounts that are eliminated in consolidation, but that expose us to fluctuations in currency exchange rates. Exchange rate fluctuations on short-term intercompany accounts are also reported in other income (expense), net. Foreign currency transaction gains (losses) included in other income (expense), net were $(0.4) million and $(1.4) million for the three and six months ended December 31, 2008. We are not currently party to any derivative financial instruments as hedges against currency fluctuations.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that an increase or decrease in exchange rates of 10% for all currencies could be experienced in the near term. These reasonably possible changes in exchange rates of 10% were applied to total net monetary assets denominated in currencies other than the local currencies at the balance sheet dates to compute the impact these changes would have had on our income before taxes in the near term. A hypothetical

decrease in exchange rates of 10%, or strengthening of the United States dollar, would have resulted in a decrease of $0.8 million on our income before taxes for the three months ended December 31, 2008. A similar decrease in exchange rates of 10%, or strengthening of the United States dollar, would have resulted in a decrease of $1.7 million on our income before taxes for the same period in 2007.

18

Table of Contents

Our Dutch subsidiary maintains a credit facility with ABN AMRO Bank N.V. pursuant to which it has borrowed 6.2 million euro. At December 31, 2008, we had short-term borrowings related to current portion of long-term debt denominated in euros. The carrying value of these short-term borrowings approximates fair value due to their short period to maturity. Assuming a hypothetical 10% increase or decrease in the euro to United States dollar period end exchange rate, the impact to the fair value of these short-term borrowings would be immaterial. The potential increase or decrease in fair value was estimated by calculating the fair value of the short-term borrowings at December 31, 2008 and comparing that with the fair value using the hypothetical period end exchange rate. At December 31, 2008, there was $6.1 million outstanding under this credit agreement.

## ITEM 4.    CONTROLS AND PROCEDURES

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2008. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2008, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the fiscal quarter ended December 31, 2008 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

## ITEM 1.    LEGAL PROCEEDINGS

On July 27, 2006, our wholly-owned subsidiary VistaPrint Technologies Limited filed a patent infringement lawsuit against print24 GmbH, unitedprint.com AG and their two managing directors in the District Court in Düsseldorf Germany, alleging infringement by the defendants in Germany of one of VistaPrint's European patents related to computer-implemented methods and apparatus for generating pre-press graphic files. On June 7, 2007, unitedprint.com AG filed a patent nullification action in the German Patent Court in relation to the same European patent at issue in VistaPrint's infringement lawsuit against print24 and its co-defendants. On July 31, 2007, the District Court in Düsseldorf ruled in VistaPrint's favor on the underlying infringement claim against print24 and its co-defendants, granting all elements of the requested injunction and ordering the defendants to pay damages for past infringement. The Düsseldorf District Court's ruling went into effect in early September 2007 and was not appealed by the defendants. On November 13, 2008, the German Patent Court held an oral hearing on the patent nullification action brought by unitedprint.com and revoked the patent at issue. The Patent Court indicated that it will prepare a written opinion stating the basis for its ruling, following which VistaPrint may choose to appeal the Patent Court's ruling to the German Supreme Court. We are unable to express an opinion as to the likely outcome of any such appeal.

On May 14, 2007, VistaPrint Technologies Limited filed a patent infringement lawsuit against 123Print, Inc. and Drawing Board (US), Inc., subsidiaries of Taylor Corporation, in the United States District Court for the District of Minnesota. The complaint in the lawsuit asserts that the defendants have infringed and continue to infringe three U.S. patents owned by VistaPrint Technologies Limited related to browser-based tools for online product design. The complaint seeks an injunction against the defendants and the recovery of damages. The defendants filed their Answer and Counterclaims to the complaint on June 7, 2007, in which they denied the infringement allegations and asserted counterclaims for declaratory judgment of invalidity, unenforceability and non-infringement of the patents-in-suit. In August 2007, another Taylor Corporation subsidiary, Taylor Strategic Accounts, Inc., was added as an additional defendant in the case. The exchange of relevant documents and records and the depositions of fact witnesses in connection with the allegations of the parties have been substantially completed. In early June 2008, newly discovered third party prior art documents were introduced into the litigation. These documents had not been reviewed and considered by the U.S. Patent Office prior to issuance of the patents-in-suit. For that reason, on June 30, 2008, VistaPrint Technologies Limited requested the United States District Court to stay the litigation to provide the U.S. Patent Office an opportunity to reexamine the patents-in-suit in light of these

19

Table of Contents

newly discovered documents. The defendants opposed VistaPrint Technologies Limited's request for a stay. On September 2, 2008, the Court granted VistaPrint Technologies Limited's request for a stay. Subsequent to the Court's decision, VistaPrint Technologies Limited submitted a request for reexamination of each of the patents-in-suit to the U.S. Patent Office. Pursuant to the Court's order, the stay will remain in place pending the resolution of the requests for reexamination. On October 28, 2008, a St. Paul, Minnesota law firm also filed requests with the U.S. Patent Office seeking reexamination of two of the three patents-in-suit. The name of the client who engaged the firm to prepare and file the reexamination requests was not disclosed by the firm, but we believe that the client was either Taylor Corporation or an affiliate of Taylor Corporation. We are unable to express an opinion as to the likely outcome of any such reexamination.

On July 29, 2008, a purported class action lawsuit was filed in the United States District Court for the Southern District of Texas (the "Texas Complaint") against VistaPrint Corp., VistaPrint USA, Inc., Vertrue, Inc. and Adaptive Marketing, LLC (collectively, the "Defendants"). Adaptive Marketing, LLC is a Vertrue, Inc. company that provides subscription-based membership discount programs, including programs that are offered on our VistaPrint.com website (Vertrue, Inc. and Adaptive Marketing, LLC are sometimes collectively referred to herein as the "Vertrue Defendants"). The Texas Complaint alleges that the Defendants violated, among other statutes, the Electronic Funds Transfer Act, the Electronic Communications Privacy Act, the Texas Deceptive Trade Practices-Consumer Protection Act and the Texas Theft Liability Act, in connection with certain membership discount programs offered to VistaPrint customers on our VistaPrint.com website. The Texas Complaint also seeks recovery for unjust enrichment, conversion, and similar common law claims. Subsequent to the filing of the Texas complaint, on July 31, 2008, August 25, 2008, September 3, 2008, September 10, 2008 and September 11, 2008, nearly identical purported class action lawsuits were filed in the United States District Court, District of New Jersey, the United States District Court, Southern District of Alabama, the United States District Court, District of Nevada, the United States District Court, District of Massachusetts, and the United States District Court, District of Florida, respectively, against the same Defendants, and in one case VistaPrint Ltd., on behalf of different plaintiffs. The complaints in each of these nearly identical lawsuits include substantially the same purported Federal and common law claims as the Texas Complaint but contain different state law claims. In addition, on August 28, 2008, a purported class action lawsuit asserting substantially the same Federal and common law claims as the Texas Complaint, but containing a state law claim under the Massachusetts Unfair Trade Practices Act, was filed by a different plaintiff in the United States District Court, District of Massachusetts, against VistaPrint Ltd., VistaPrint USA, Inc. and the Vertrue Defendants.

Among other allegations, the plaintiffs in each action claim that after ordering products on our VistaPrint.com website they were enrolled in certain membership discount programs operated by the Vertrue Defendants and that monthly subscription fees for the programs were subsequently charged directly to the credit or debit cards they used to make purchases on VistaPrint.com, in each case purportedly without their knowledge or authorization. The plaintiffs also claim that the Defendants failed to disclose to them that the credit or debit card information they provided to make purchases on VistaPrint.com would be disclosed to the Vertrue Defendants and would be used to pay for monthly subscriptions for the membership discount programs. The plaintiffs have requested that the Defendants be enjoined from engaging in the practices complained of by the plaintiffs. They also are seeking an unspecified amount of damages, including statutory and punitive damages, as well as pre-judgment and post-judgment interest and attorneys' fees and costs for the purported class.

On September 8, 2008, VistaPrint USA, Incorporated filed an Answer to the Texas Complaint in the United States District Court for the Southern District of Texas, and on September 9, 2008, VistaPrint USA, Incorporated filed a Motion to Dismiss for Improper Venue in the United States District Court for the Southern District of Texas. Subsequently, on or about September 16, 2008, the plaintiff in one of the cases pending before the United States District Court for the District of Massachusetts filed a Motion before the Judicial Panel on Multidistrict Litigation seeking the consolidation and transfer of pretrial proceedings in all of the outstanding cases to the Massachusetts District Court. Following that, on or about September 24, 2008 and September 25, 2008, the Vertrue Defendants and VistaPrint USA, Incorporated and VistaPrint Limited, respectively, filed motions before the Judicial Panel on Multidistrict Litigation to transfer all of the outstanding cases, as well as any cases subsequently filed involving similar facts or claims, to the United States District Court for the Southern District of Texas for coordinated pretrial proceedings. All of the purported class action lawsuits in which the Defendants have been served were subsequently stayed pending resolution of the motions for consolidation and transfer pending before the Judicial Panel on Multidistrict Litigation. On December 11, 2008, the Judicial Panel on Multidistrict Litigation ruled in favor of the motions brought by the Vertrue Defendants, VistaPrint USA, Incorporated and VistaPrint Limited and ordered the transfer of all of the outstanding cases to the United States District Court for the Southern District of Texas for coordinated pretrial proceedings.

We believe we have meritorious defenses to these purported class action lawsuits and intend to defend these actions vigorously. However, the lawsuits are in their earliest stages and we are unable to express an opinion as to the likely outcome of such actions.

We are not currently party to any other material legal proceedings. We are involved, from time to time, in various legal proceedings arising from the normal course of business activities. Although the results of litigation and claims cannot be predicted with certainty, we do not expect resolution of these matters to have a material adverse impact on its consolidated results of operations, cash flows or financial position. However, an unfavorable resolution of such a proceeding could, depending on its amount

and timing, materially affect our results of operations, cash flows or financial position in a future period. Regardless of the outcome, litigation can have an adverse impact on us because of defense costs, diversion of management resources and other factors.

20

Table of Contents

## ITEM 1A. RISK FACTORS

We caution you that the following important factors, among others, could cause our actual results to differ materially from those expressed in forward-looking statements made by us or on our behalf in filings with the Securities and Exchange Commission, press releases, communications with investors and oral statements. Any or all of our forward-looking statements in this Quarterly Report on Form 10-Q and in any other public statements we make may turn out to be wrong. These statements can be affected by, among other things, inaccurate assumptions we might make or by known or unknown risks and uncertainties or risks we currently deem immaterial. Many factors mentioned in the discussion below will be important in determining future results. Consequently, no forward-looking statement can be guaranteed. Actual future results may vary materially from those contained in forward looking statements made in this Quarterly Report on Form 10-Q and in our public statements. We undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### Risks Related to Our Business

**If we are unable to attract customers in a cost-effective manner, our business and results of operations could be harmed.**

Our success depends on our ability to attract customers in a cost-effective manner. We rely on a variety of methods to draw visitors to our websites and promote our products and services, including purchased search results from online search engines, e-mail, telesales, and direct mail. We pay providers of online services, search engines, directories and other websites and e-commerce businesses to provide content, advertising banners and other links that direct customers to our websites. We also promote our products and special offers through e-mail, telesales and direct mail, targeted to repeat and potential customers. In addition, we rely heavily upon word of mouth customer referrals. If we are unable to develop or maintain an effective means of reaching small businesses and consumers, the costs of attracting customers using these methods significantly increase, or we are unable to develop new cost-effective means to obtain customers, our ability to attract new and repeat customers would be harmed, traffic to our websites would be reduced and our business and results of operations would be harmed.

**Purchasers of small business marketing products and services, including graphic design and customized printing, may not choose to shop online, which would prevent us from acquiring new customers which are necessary to the success of our business.**

The online market for small business marketing products and services is less developed than the online market for other business and consumer products. If this market does not gain widespread acceptance, our business may suffer. Our success will depend in part on our ability to attract customers who have historically purchased printed products and graphic design services through traditional printing operations and graphic design businesses or who have produced graphic design and printed products using self-service alternatives. Furthermore, we may have to incur significantly higher and more sustained advertising and promotional expenditures or price our services and products more competitively than we currently anticipate in order to attract additional online consumers to our websites and convert them into purchasing customers. Specific factors that could prevent prospective customers from purchasing from us include:

- concerns about buying graphic design services and printed products without face-to-face interaction with sales personnel;

- the inability to physically handle and examine product samples;

- delivery time associated with Internet orders;

- concerns about the security of online transactions and the privacy of personal information;

- delayed shipments or shipments of incorrect or damaged products; and

- inconvenience associated with returning or exchanging purchased items.

**We may not succeed in promoting, strengthening and continuing to establish the VistaPrint brand, which would prevent us from acquiring new customers and increasing revenues.**

Since our products and services are sold primarily through our websites, the success of our business depends upon our ability to attract new and repeat customers to our websites in order to increase business and grow our revenues. For this reason, a primary component of our business strategy is the continued promotion and strengthening of the VistaPrint brand. In addition to the challenges posed by establishing and promoting our brand among the many businesses that promote products and services on the Internet, we face significant competition from graphic design and printing companies marketing to small businesses who also seek to establish

21

Table of Contents

strong brands. If we are unable to successfully promote the VistaPrint brand, we may fail to increase our revenues. Customer awareness of, and the perceived value of, our brand will depend largely on the success of our marketing efforts and our ability to provide a consistent, high-quality customer experience. To promote our brand, we have incurred and will continue to incur substantial expense related to advertising and other marketing efforts. We may choose to increase our branding expense materially, but we cannot be sure that this investment will be profitable. Underperformance of significant future branding efforts could materially damage our financial results.

A component of our brand promotion strategy is establishing a relationship of trust with our customers, which we believe can be achieved by providing a high-quality customer experience. In order to provide a high-quality customer experience, we have invested and will continue to invest substantial amounts of resources in our website development and technology, graphic design operations, production operations, and customer service operations. We also redesign our websites from time to time to seek and attract customers to our websites. Our ability to provide a high-quality customer experience is also dependent, in large part, on external factors over which we may have little or no control, including the reliability and performance of our suppliers, third-party carriers and communication infrastructure providers. If we are unable to provide customers with a high-quality customer experience for any reason, our reputation would be harmed and our efforts to develop VistaPrint as a trusted brand would be adversely impacted. The failure of our brand promotion activities could adversely affect our ability to attract new customers and maintain customer relationships, and, as a result, substantially harm our business and results of operations.

**We are dependent upon our own facilities for the production of products sold to our customers and any significant interruption in the operations of these facilities or any inability to increase capacity at these facilities would have an adverse impact on our business.**

We produce all of our products internally at our facilities in Windsor, Ontario, Canada and Venlo, the Netherlands. We seek to ensure that we can satisfy all of our production demand from our facilities, including at periods of peak demand, while maintaining the level of product quality and timeliness of delivery that customers require. If we are unable to meet demand from our own facilities or to successfully expand those facilities on a timely basis to meet customer demand, we would likely turn to an alternative supplier in an effort to supplement our production capacity. However, an alternative supplier may not be able to meet our production requirements on a timely basis or on commercially acceptable terms, or at all. If we are unable to fulfill orders in a timely fashion at a high level of product quality through our facilities and are unable to find a satisfactory supply replacement, our business and results of operations would be substantially harmed.

**Our quarterly financial results may fluctuate which may lead to volatility in our share price.**

Our future revenues and operating results may vary significantly from quarter-to-quarter due to a number of factors, many of which are outside of our control. Factors that could cause our quarterly revenue and operating results to fluctuate include, among others:

- seasonality-driven or other variations in the demand for our services and products;

- our ability to attract visitors to our websites and convert those visitors into customers;

- our ability to retain customers and encourage repeat purchases;

- business and consumer preferences for our products and services;

- shifts in product mix toward lower gross margin products;

- investment decisions by management made in relation to our performance against targeted earnings per share levels;

- our ability to manage our production and fulfillment operations;

- currency fluctuations, which affect not only our revenues but also our costs;

- the costs to produce our products and to provide our services;

- our pricing and marketing strategies and those of our competitors;

- improvements to the quality, cost and convenience of desktop printing;

- costs of expanding or enhancing our technology or websites;

- compensation expense and charges related to our awarding of share-based compensation; and

- a significant increase in credits, beyond our estimated allowances, for customers who are not satisfied with our products.

In addition, management investment decisions may lead to fluctuations in our quarterly financial results. We base our operating expense budgets in part on expected revenue trends. A portion of our expenses, such as office leases and various personnel costs, are

relatively fixed. We may be unable to adjust spending quickly enough to offset any revenue shortfall. Accordingly, any shortfall in revenue may cause significant variation in operating results in any quarter.

22

Table of Contents

Based on the factors cited above, among others, we believe that quarter-to-quarter comparisons of our operating results may not be a good indication of our future performance. It is possible that in one or more future quarters, our operating results may be below the expectations of public market analysts and investors. In that event, the trading price of our common shares may fall.

**The markets for small business marketing products and services and consumer custom products are intensely competitive and we may be unsuccessful in competing against current and future competitors, which could result in price reductions and/or decreased demand for our products.**

The markets for small business marketing products and services and consumer custom products, including the printing and graphic design market, are intensely competitive, with many existing and potential competitors, and we expect competition for online small business marketing and consumer custom products and services to increase in the future. Competition may result in price pressure, reduced profit margins and loss of market share, any of which could substantially harm our business and results of operations. The markets for small business marketing products and services and for consumer custom products traditionally are highly fragmented and geographically dispersed. The increased use of the Internet for commerce and other technical advances have allowed traditional providers of these products and services to improve the quality of their offerings, produce those products and deliver those services more efficiently and reach a broader purchasing public. Current and potential competitors include:

- self-service desktop design and publishing using a combination of (1) software such as Microsoft Publisher, Microsoft Word and Broderbund PrintShop; (2) desktop printers or copiers and (3) specialty paper supplies;

- traditional printing and graphic design companies;

- providers of technologies, such as websites, e-mail and electronic files, which may act as a substitute for printed materials;

- office supplies and photocopy companies such as Office Depot, FedEx Office, and Staples;

- wholesale printers such as Taylor Corporation and Business Cards Tomorrow International;

- online apparel suppliers such as CaféPress, Lids, and Zazzle;

- website design and hosting companies such as United Internet, Microsoft, Yahoo!, Godaddy, Intuit, Web.com, and 1&1; and

- other online printing and graphic design companies.

Many of our current and potential competitors have advantages over us, including longer operating histories, greater brand recognition, existing customer and supplier relationships, and significantly greater financial, marketing and other resources. Many of our competitors work together. For example, Taylor Corporation sells printed products through office superstores such as Staples and Office Depot.

Some of our competitors who either already have an online presence or are seeking to establish an online presence may be able to devote substantially more resources to website and systems development than we can. In addition, larger, more established and better capitalized entities may acquire, invest or partner with traditional and online competitors as use of the Internet and other online services increases. Competitors may also seek to develop new products, technologies or capabilities that could render many of the products, services and content we offer obsolete or less competitive, which could harm our business and results of operations.

In addition, we have in the past and may in the future choose to collaborate with certain of our existing and potential competitors in strategic partnerships that we believe will improve our competitive position and results of operations, such as through a retail in-store or web-based collaborative offering. It is possible, however, that such ventures will be unsuccessful and our competitive position and results of operations will be adversely affected as a result of such collaboration.

**Our failure to meet our customers' price expectations would adversely affect our business and results of operations.**

Demand for our products and services has been sensitive to price. Changes in our pricing strategies have had, and may continue to have, a significant impact on our revenues and net income. We offer certain free products and services as a means of attracting customers and we offer substantial pricing discounts as a means of encouraging repeat purchases. Such free offers and discounts may not result in an increase in revenues or the optimization of profits. In addition, many factors, including our production and personnel costs and our competitors' pricing and marketing strategies, can significantly impact our pricing strategies. If we fail to meet our customers' price expectations in any given period, our business and results of operations will suffer.

**We depend on search engines to attract a substantial portion of the customers who visit our websites, and losing these customers would adversely affect our business and results of operations.**

Many customers access our websites by clicking through on search results displayed by search engines such as Google and

Yahoo! Search engines typically provide two types of search results, algorithmic and purchased listings. Algorithmic listings cannot be purchased, and instead are determined and displayed solely by a set of formulas designed by the search engine. Purchased listings can be purchased by companies and other entities in order to attract users to their websites. We rely on both algorithmic and purchased

23

Table of Contents

listings to attract and direct a substantial portion of the customers we serve. Search engines revise their algorithms from time to time in an attempt to optimize their search result listings. If search engines on which we rely for algorithmic listings modify their algorithms, this could result in fewer customers clicking through to our websites, requiring us to resort to other more costly resources to replace this traffic, which, in turn, could reduce our operating and net income or our revenues, prevent us from maintaining or increasing profitability and harm our business. If one or more search engines on which we rely for purchased listings modifies or terminates its relationship with us, our expenses could rise, our revenues could decline and our business may suffer. The cost of purchased search listing advertising is rapidly increasing as demand for these channels continues to grow quickly, and further increases could have negative effects on our ability to maintain or increase profitability. In addition, many of our competitors purchase the term "VistaPrint" and other terms incorporating our proprietary trademarks from Google and other search engines as part of their search listing advertising. European courts have, in certain cases, upheld the rights of trademark owners to prevent such practices in certain European jurisdictions. However, U.S. courts have not sided with the trademark owners in cases involving U.S. search engines, and Google has refused to prevent companies from purchasing trademarked terms belonging to other parties. As a result, we may not be able to prevent our competitors from advertising to, and directly competing for, customers who search on the term "VistaPrint" on U.S. search engines.

**Various private 'spam' blacklisting or similar entities have in the past, and may in the future, interfere with our e-mail solicitation, the operation of our websites and our ability to conduct business.**

We depend primarily on e-mail to market to and communicate with our customers. Various private entities attempt to regulate the use of e-mail for commercial solicitation. These entities often advocate standards of conduct or practice that significantly exceed current legal requirements and classify certain e-mail solicitations that comply with current legal requirements as unsolicited bulk e-mails, or "spam." Some of these entities maintain "blacklists" of companies and individuals, and the websites, Internet service providers and Internet protocol addresses associated with those companies and individuals, that do not adhere to what the blacklisting entity believes are appropriate standards of conduct or practices for commercial e-mail solicitations. If a company's Internet protocol addresses are listed by a blacklisting entity, e-mails sent from those addresses may be blocked if they are sent to any Internet domain or Internet address that subscribes to the blacklisting entity's service or purchases its blacklist.

Some of our Internet protocol addresses currently are listed with one or more blacklisting entities despite our belief that our commercial e-mail solicitations comply with all applicable laws. In the future, our other Internet protocol addresses may also be listed with one or more blacklisting entities. We may not be successful in convincing the blacklisting entities to remove us from their lists. Although the blacklisting we have experienced in the past has not had a significant impact on our ability to operate our websites or to send commercial e-mail solicitations, it has, from time to time, interfered with our ability to send operational e-mails—such as password reminders, invoices and electronically delivered products—to customers and others. In addition, as a result of being blacklisted, we have had disputes with, or concerns raised by, various service providers who perform services for us, including co-location and hosting services, Internet service providers and electronic mail distribution services. There can be no guarantee that we will not continue to be blacklisted or that we will be able to successfully remove ourselves from those lists. Blacklisting of this type could interfere with our ability to market our products and services, communicate with our customers and otherwise operate our websites, all of which could have a material negative impact on our business and results of operations.

**We may not succeed in cross selling additional products and services to our customers.**

We seek to acquire customers based on their interest in one or more of our products and then offer additional related products to those customers. If our customers are not interested in our additional products or have an adverse experience with the products they were initially interested in, the sale of additional products and services to those customers and our ability to increase our revenue and to improve our results of operations could be adversely affected.

**Interruptions to our website operations, information technology systems, production processes or customer service operations as a result of natural disasters, errors in our technology, capacity constraints, security breaches or other causes could damage our reputation and brand and substantially harm our business and results of operations.**

The satisfactory performance, reliability and availability of our websites, transaction processing systems, network infrastructure, production facilities and customer service operations are critical to our reputation, and our ability to attract and retain customers and to maintain adequate customer service levels. Any future interruptions that result in the unavailability of our websites, reduced order fulfillment performance or interfere with customer service operations could result in negative publicity, damage our reputation and brand and cause our business and results of operations to suffer. We may experience temporary interruptions in our operations for a variety of reasons in the future, including human error, software errors, power loss, telecommunication failures, fire, flood, extreme weather, political instability, acts of terrorism, war, break-ins and security breaches, and other events beyond our control. In particular, both Bermuda, where substantially all of the computer hardware necessary to operate our websites is located in a single facility, and Jamaica, the location of most of our customer service and design service operations, are subject to a high degree of hurricane risk and extreme weather conditions that could have a devastating impact on our facilities and operations.

Table of Contents

Our technology, infrastructure and processes may contain undetected errors or design faults. These errors or design faults may cause our websites to fail and result in loss of, or delay in, market acceptance of our products and services. In the past, we have experienced delays in website releases and customer dissatisfaction during the period required to correct errors and design faults in our websites that caused us to lose revenue. In the future, we may encounter additional issues, such as scalability limitations, in current or future technology releases. A delay in the commercial release of any future version of our technology or implementing improvements in our infrastructure and processes could seriously harm our business. In addition, our systems could suffer computer viruses and similar disruptions, which could lead to loss of critical data or the unauthorized disclosure of confidential customer data.

Our business requires that we have adequate capacity in our computer systems to cope with the high volume of visits to our websites, particularly during promotional campaign periods. As our operations grow in size and scope, we will need to improve and upgrade our computer systems and network infrastructure to offer customers enhanced and new products, services, capacity, features and functionality. The expansion of our systems and infrastructure may require us to commit substantial financial, operational and technical resources before the volume of our business increases, with no assurance that our revenues will increase.

Any failure of our equipment may prevent the production of orders and interfere with our ability to fulfill orders. Substantially all of our production operations are performed in two facilities: our Dutch production facility serving European and Asia-Pacific markets and our Windsor, Ontario production facility serving North American markets.

We do not presently have redundant systems operational in multiple locations. In addition, we are dependent in part on third parties for the implementation and maintenance of certain aspects of our communications and printing systems, and because many of the causes of system interruptions or interruptions of the production process may be outside of our control, we may not be able to remedy such interruptions in a timely manner, or at all. We do carry business interruption insurance to compensate us for losses that may occur in the event operations at facilities are interrupted, but these policies do not address all potential causes of business interruptions we may experience and any proceeds we may receive may not fully compensate us for all of the revenue we may lose.

The occurrence of any of the foregoing could substantially harm our business and results of operations.

**Our customers create products that incorporate images, illustrations and fonts which we license from third parties, and any loss of the right to use these licensed materials may substantially harm our business and results of operations.**

Many of the images, illustrations, and fonts incorporated in the design products and services we offer are the copyrighted property of other parties used by us under license agreements. If one or more of these licenses were to be terminated, the amount and variety of content available on our websites would be significantly reduced. In such event, we could experience delays in obtaining and introducing substitute materials and substitute materials might be available only under less favorable terms or at a higher cost, or may not be available at all. Any of the foregoing would have an adverse effect on our business and results of operations.

**If we are unable to market and sell products and services beyond our existing target markets and develop new products and services to attract new customers, our results of operations may suffer.**

We have developed products and services and implemented marketing strategies designed to attract small business owners and consumers to our websites and encourage them to purchase our products and services. We believe we will need to address additional markets and attract new customers to further grow our business. To access new markets and customers we expect that we will need to develop, market and sell new products and additional services that address their needs. To access new markets, we also intend to continue expansion of our marketing efforts and customer service outside of North America and to continue to introduce localized websites in different countries and languages. In addition, we intend to focus on developing new strategic relationships to expand our marketing and sales channels, such as co-branded or strategic partner-branded websites and retail in-store offerings. Any failure to develop new products and services, expand our business beyond our existing target markets and customers, and address additional market opportunities could harm our business, financial condition and results of operations.

25

Table of Contents

**The development of our business since the launch of the VistaPrint.com website in April 2000 has been attributable to organic growth, but in the future we may choose to undertake acquisitions to further expand our business, which may pose risks to our business and dilute the ownership of our existing shareholders.**

      Our business and our customer base have been built through organic growth. Key components of our business strategy include, among others, expanding our customer base, targeting additional markets and business opportunities, and expanding our product and service offerings. To execute our expansion strategy, we expect that we will selectively pursue acquisitions of businesses, technologies or services in order to expand our capabilities, enter new markets, or increase our market share. We do not have any experience making acquisitions. Integrating any newly acquired businesses, technologies or services is likely to be expensive and time consuming. To finance any acquisitions, it may be necessary for us to raise additional funds through public or private financings. Additional funds may not be available on terms that are favorable to us, or at all, and, in the case of equity financings, would result in dilution to our shareholders and, in the case of debt financings, may subject us to covenants restricting the activities we may undertake in the future. If we do complete any acquisitions, we may be unable to operate the acquired businesses profitably or otherwise implement our strategy successfully. If we are unable to integrate any newly acquired businesses, technologies or services effectively, our business and results of operations could suffer. The time and expense associated with finding suitable and compatible businesses, technologies or services to acquire could also disrupt our ongoing business and divert our management's attention. Future acquisitions by us could also result in large and immediate write-offs or assumptions of debt and contingent liabilities, any of which could substantially harm our business and results of operations.

26

Table of Contents

**The loss of key personnel or an inability to attract and retain additional personnel could affect our ability to successfully grow our business.**

We are highly dependent upon the continued service and performance of our senior management team and key technical, marketing and production personnel including, in particular, Robert S. Keane, our Chairman, President and Chief Executive Officer, Janet Holian, our President of VistaPrint Europe, Wendy Cebula, our President of VistaPrint North America and Michael Giannetto, our Chief Financial Officer. None of these executives are a party to an employment agreement with VistaPrint, and therefore may cease their employment with us at any time with no advance notice. The loss of one or more of these or other key employees may significantly delay or prevent the achievement of our business objectives. We face intense competition for qualified individuals from numerous technology, marketing, financial services, manufacturing and e-commerce companies. We may be unable to attract and retain suitably qualified individuals, and our failure to do so could have an adverse effect on our ability to implement our business plan.

**If we are unable to manage our expected growth and expand our operations successfully, our reputation would be damaged and our business and results of operations would be harmed.**

We have rapidly grown to over 1,640 employees and approximately 160 temporary employees as of December 31, 2008. As of December 31, 2008, we have website operations, offices, marketing, manufacturing research and development and production facilities and customer support centers in Bermuda, the United States, the Netherlands, Spain, Jamaica, Switzerland, and Canada. Our growth, combined with the geographical separation of our operations, has placed, and will continue to place, a strain on our administrative and operational infrastructure. Our ability to manage our operations and anticipated growth will require us to continue to refine our operational, financial and management controls, human resource policies, reporting systems and procedures in the locations in which we operate. We expect the number of countries and offices from which we operate to continue to increase in the future.

We may not be able to implement improvements to our management information and control systems in an efficient or timely manner and may discover deficiencies in existing systems and controls. If we are unable to manage expected future expansion, our ability to provide a high-quality customer experience could be harmed, which would damage our reputation and brand and substantially harm our business and results of operations.

**If we are unable to manage the challenges associated with our international operations, the growth of our business could be negatively impacted.**

We have a limited history of managing operations in multiple countries. From 2001 to 2004, all of our business was conducted from one facility located in the United States and from our website operations in Bermuda. Since that time, we have expanded our business to include operations in seven different countries. For example, we operate production facilities in Venlo, the Netherlands and Windsor, Ontario, Canada, a customer support, sales and service, and graphic design center in Montego Bay, Jamaica, website operations in Devonshire, Bermuda, our European headquarters and marketing office in Barcelona, Spain, a technology development facility in Winterthur, Switzerland, and technology development, marketing, finance and administrative operations in Lexington, Massachusetts, United States. We have localized websites to serve many additional international markets. For the three and six months ended December 31, 2008, we derived 42% and 40% respectively, of our revenue from our non-United States websites. We are subject to a number of risks and challenges that specifically relate to our international operations. These risks and challenges include, among others:

- fluctuations in foreign currency exchange rates that may increase the United States dollar cost of, or reduce United States dollar revenue from, our international operations;

- difficulty managing operations in, and communications among, multiple locations and time zones;

- local regulations that may restrict or impair our ability to conduct our business as planned;

- protectionist laws and business practices that favor local producers and service providers;

- failure to properly understand and develop graphic design content and product formats appropriate for local tastes;

- restrictions imposed by local labor practices and laws on our business and operations; and

- failure of local laws to provide a sufficient degree of protection against infringement of our intellectual property.

We also have limited experience in confronting and addressing the risks and challenges we face in operating in several countries. Our international operations may not be successful if we are unable to meet and overcome these challenges, which could limit the growth of our business and may have an adverse effect on our business and operating results.

Table of Contents

**Our business and results of operations may be negatively impacted by general economic and financial market conditions and such conditions may increase the other risks that affect our business.**

The world's financial markets are currently experiencing significant turmoil, resulting in reductions in available credit, dramatically increased costs of credit, increased volatility in security prices, rating downgrades of investments and reduced valuations of securities generally. These events have materially and adversely impacted the availability of financing to a wide variety of businesses, including small businesses, and the resulting uncertainty has led to reductions in capital investments, overall spending levels, future product plans, and sales projections across industries and markets. These trends could have a material and adverse impact on the overall demand for our products and services and our ability to achieve targeted financial results, as well as our overall financial results from operations. We are unable to predict the likely duration and severity of the current disruption in financial markets and adverse economic conditions in the U.S. and other countries, but the longer the duration the greater risks we face in operating our business.

**The United States government may substantially increase border controls and impose duties or restrictions on cross-border commerce that may substantially harm our business.**

For the three and six months ended December 31, 2008, we derived 58% and 60% respectively, of our revenue from sales to customers made through our United States website. We produce products for our United States customers at our facility in Windsor, Ontario. Restrictions on shipping goods into the United States from Canada pose a substantial risk to our business. Particularly since the terrorist attacks on September 11, 2001, the United States government has substantially increased border surveillance and controls. We have from time to time experienced significant delays in shipping our manufactured products into the United States as a result of these controls, which has, in some instances, resulted in delayed delivery of orders.

The United States also imposes protectionist measures, such as customs duties and tariffs, that limit free trade. Some of these measures may apply directly to product categories that comprise a material portion of our revenues. The customs laws, rules and regulations that we are required to comply with are complex and subject to unpredictable enforcement and modification. If the United States were to impose further border controls and restrictions, interpret or apply regulations in a manner unfavorable to the U.S., impose quotas, tariffs or import duties, increase the documentation requirements applicable to cross border shipments or take other actions that have the effect of restricting the flow of goods from Canada and other countries to the United States, we may have greater difficulty shipping products into the United States or be foreclosed from doing so, experience shipping delays, or incur increased costs and expenses, all of which would substantially impair our ability to serve the United States market and harm our business and results of operations.

**We may not be able to protect our intellectual property rights, which may impede our ability to build brand identity, cause confusion among our customers, damage our reputation and permit others to practice our patented technology, which could substantially harm our business and results of operations.**

We rely on a combination of patent, trademark, trade secret and copyright law and contractual restrictions to protect our intellectual property. These protective measures afford only limited protection. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our trademarks, our websites features and functionalities or to obtain and use information that we consider proprietary, such as the technology used to operate our websites and our production operations.

As of December 31, 2008, we held 19 issued United States patents, 4 patents in other countries and we had more than 40 patent applications pending in the United States and other countries. We intend to continue to pursue patent coverage in the United States and other countries to the extent we believe such coverage is justified, appropriate, and cost efficient. There can be no guarantee that any of our pending applications or continuation patent applications will be granted. In addition, there could be infringement, invalidity, co-inventorship or similar claims brought by third parties with respect to any of our currently issued patents or any patents that may be issued to us in the future. For example, administrative opposition proceedings asking the European Patent Office to reconsider the allowance of one of our European patents relating to certain downloadable document design programs and methods were filed in 2005. At a hearing held in April 2008, an opposition panel of the European Patent Office indicated its intention to revoke the patent at issue. The opposition panel's decision has not yet taken effect and we intend to appeal the decision. Any similar claims, whether or not successful, could be extremely costly, could damage our reputation and brand and substantially harm our business and results of operations.

Our primary brand is "VistaPrint." We hold trademark registrations for the VistaPrint trademark in the United States, the European Union, Canada, Japan and various other jurisdictions. Our competitors or other entities may adopt names or marks similar to ours, thereby impeding our ability to build brand identity and possibly leading to customer confusion. There are several companies that currently incorporate or may incorporate in the future "Vista" into their company, product or service names, such as Microsoft Corporation's decision to name one of its operating systems "Microsoft Vista." There could be potential trade name or trademark infringement claims brought by owners of other registered trademarks or trademarks that incorporate variations of the term VistaPrint or our other trademarks, and we may institute such claims against other parties. Any claims or customer confusion related to our

Case4:08-cv-05261-SBA    Document21-2    Filed03/13/09    Page43 of 58

trademarks could damage our reputation and brand and substantially harm our business and results of operations.

28

Table of Contents

**If we become involved in intellectual property litigation or other proceedings related to a determination of rights, we could incur substantial costs, expenses or liability, lose our exclusive rights or be required to stop certain of our business activities.**

A third party may sue us for infringing its intellectual property rights. In addition, a third party may claim that we have improperly obtained or used its confidential or proprietary information. We have, in the past, received letters from third parties that state that these third parties have patent rights that cover aspects of the technology that we use in our business and that the third parties believe we are obligated to license in order to continue to use such technology. Similarly, companies or individuals with whom we currently have a business relationship, or have had a past business relationship, may commence an action seeking rights in one or more of our patents or pending patent applications.

The cost to us of any litigation or other proceeding relating to intellectual property rights, even if resolved in our favor, could be substantial, and the litigation would divert our management's efforts from growing our business. Potential adversaries may be able to sustain the costs of complex intellectual property litigation more effectively than we can because they have substantially greater resources. Uncertainties resulting from the initiation and continuation of any litigation could limit our ability to continue our operations or may prevent or delay our acquisition by a third party. If any parties successfully claim that our sale, use, manufacturing or importation of technologies infringes upon their intellectual property rights, we might be forced to pay damages and attorney's fees. Additionally, if we are found to have willfully infringed a third parties' patent, we may be liable for treble damages and a court could enjoin us from performing the infringing activity. Thus, the situation could arise in which our ability to use certain technologies important to the operation of our business would be restricted by a court order.

Alternatively, we may be required to, or decide to, enter into a license with a third party that claims infringement by us. Any license required under any patent may not be made available on commercially acceptable terms, if at all. In addition, such licenses are likely to be non-exclusive and, therefore, our competitors may have access to the same technology licensed to us. If we fail to obtain a required license and are unable to design around a third party's patent, we may be unable to effectively conduct certain of our business activities, which could limit our ability to generate revenues or maintain profitability and possibly prevent us from generating revenue sufficient to sustain our operations.

In addition, we may need to resort to litigation to enforce a patent issued to us or to determine the scope and validity of third-party proprietary rights. Our ability to enforce our patents, copyrights, trademarks, and other intellectual property is subject to general litigation risks, as well as uncertainty as to the enforceability of our intellectual property rights in various countries. When we seek to enforce our rights, we may be subject to claims that the intellectual property right is invalid, is otherwise not enforceable, or is licensed to the party against whom we are asserting a claim. In addition, our assertion of intellectual property rights could result in the other party seeking to assert alleged intellectual property rights of its own against us, which may adversely impact our business in the manner discussed above. Our inability to enforce our intellectual property rights under these circumstances may negatively impact our competitive position and our business.

For instance, in May 2007, VistaPrint Technologies Limited, our wholly-owned subsidiary, initiated litigation in the United States District Court for the District of Minnesota alleging infringement by 123Print, Inc. and Drawing Board (US), Inc. of certain U.S. patents owned by VistaPrint Technologies Limited, and subsequently expanded the lawsuit to include Taylor Strategic Accounts, Inc., a related party to 123Print, Inc. and Drawing Board (US), Inc., as an additional defendant. The defendants denied the infringement allegations and asserted counterclaims for declaratory judgment of invalidity, unenforceability and non-infringement of the patents. This litigation is currently stayed pending resolution of VistaPrint Technologies Limited's requests for reexamination of the patents-in-suit before the U.S. Patent Office.

In July 2006, VistaPrint Technologies Limited filed a patent infringement lawsuit against print24 GmbH, unitedprint.com AG and their two managing directors in the District Court in Düsseldorf Germany, alleging infringement by the defendants of one of our European patents. In response to VistaPrint Technologies Limited's infringement claim, unitedprint.com AG filed a patent nullification action against us in June 2007 in German Patent Court in relation to the same European patent at issue in our infringement lawsuit against print24 and its co-defendants. On July 31, 2007, the District Court in Düsseldorf ruled in VistaPrint Technologies Limited's favor on the underlying infringement claim against print24 and its co-defendants, granting all elements of our requested injunction and ordering the defendants to pay damages for past infringement. The Düsseldorf District Court's ruling went into effect in early September 2007, and was not appealed by the defendants. On November 13, 2008, the German Patent Court held an oral hearing on the patent nullification action brought by unitedprint.com and revoked the patent at issue. The Patent Court indicated that it will prepare a written opinion stating the basis for its ruling, following which VistaPrint may choose to appeal the Patent Court's ruling to the German Supreme Court.

29

Table of Contents

**We sell our products and services primarily through our websites and our inability to acquire or maintain domain names for our websites could result in the loss of customers which would substantially harm our business and results of operations.**

We sell our products and services primarily through our websites. We currently own or control a number of Internet domain names used in connection with our various websites, including VistaPrint.com and similar names with alternate URL names, such as .net, .de and .co.uk. Domain names generally are regulated by Internet regulatory bodies. If we are unable to use a domain name in a particular country, we would be forced to either purchase the domain name from the entity that owns or controls it, which we may not be able to do on commercially acceptable terms, or at all, incur significant additional expenses to market our products within that country, including the development of a new brand and the creation of new promotional materials and packaging, or elect not to sell products in that country. Any of these results could substantially harm our business and results of operations. Furthermore, the relationship between regulations governing domain names and laws protecting trademarks and similar proprietary rights is unclear and subject to change. We might not be able to prevent third parties from acquiring domain names that infringe or otherwise decrease the value of our trademarks and other proprietary rights. Regulatory bodies could establish additional top-level domains, appoint additional domain name registrars or modify the requirements for holding domain names. As a result, we may not be able to acquire or maintain the domain names that utilize the name VistaPrint in all of the countries in which we currently or intend to conduct business.

**Our revenues may be negatively affected if we are required to charge sales or other taxes on purchases.**

We do not collect or have imposed upon us sales or other taxes related to the products and services we sell, except for certain corporate level taxes and value added and similar taxes in certain jurisdictions. However, one or more jurisdictions or countries may seek to impose sales or other tax collection obligations on us in the future. A successful assertion by one or more governments, including any country in which we do business or sub-federal authorities such as states in the United States, that we should be collecting sales or other taxes on the sale of our products could result in substantial tax liabilities for past sales, discourage customers from purchasing products from us, decrease our ability to compete with traditional retailers or otherwise substantially harm our business and results of operations.

Currently, decisions of the United States Supreme Court restrict the imposition of obligations to collect state and local sales and use taxes with respect to sales made over the Internet in the United States. However, implementation of the restrictions imposed by these Supreme Court decisions is subject to interpretation by state and local taxing authorities. While we believe that these Supreme Court decisions currently restrict state and local taxing authorities in the United States from requiring us to collect sales and use taxes from purchasers located within their jurisdictions, taxing authorities could disagree with our interpretation of these decisions. Moreover, a number of states in the United States, as well as the United States Congress, have been considering various initiatives that could limit or supersede the Supreme Court's position regarding sales and use taxes on Internet sales. If any state or local taxing jurisdiction were to disagree with our interpretation of the Supreme Court's current position regarding state and local taxation of Internet sales, or if any of these initiatives were adopted to address the Supreme Court's constitutional concerns and result in a reversal or modification of its current position, we could be required to collect sales and use taxes from purchasers in the United States. The imposition by state and local governments of various taxes upon Internet commerce could create administrative burdens for us and could decrease our future revenue. A substantial amount of our business is derived from customers in the European Union, whose tax environment is also complex and subject to changes that would be adverse to our business.

**Our business is dependent on the Internet, and unfavorable changes in government regulation of the Internet and e-commerce could substantially harm our business and results of operations.**

Due to our dependence on the Internet for most of our sales, regulations and laws specifically governing the Internet and e-commerce may have a greater impact on our operations than other more traditional businesses. Existing and future laws and regulations, including the taxation of sales through the Internet, may impede the growth of e-commerce and our ability to compete with traditional graphic designers, printers and small business marketing companies, as well as desktop printing products. These regulations and laws may cover taxation, as well as restrictions on imports and exports, customs, tariffs, user privacy, data protection, pricing, content, copyrights, distribution, electronic contracts and other communications, consumer protection, the provision of online payment services, broadband residential Internet access and the characteristics and quality of products and services. It is not clear how existing laws governing issues such as property ownership, sales and other taxes, libel and personal privacy apply to the Internet and e-commerce as the vast majority of applicable laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. Those laws that do reference the Internet, such as the Bermuda Electronic Transactions Act 1999, the U.S. Digital Millennium Copyright Act and the U.S. CAN-SPAM Act of 2003, are only beginning to be interpreted by the courts and their applicability and reach are therefore uncertain. Those current and future laws and regulations or unfavorable resolution of these issues may substantially harm our business and results of operations.

**If we were required to review the content that a customer incorporates into a product and interdict the shipment of products that violate copyright protections or other laws, our costs would significantly increase, which would harm our results of operations.**

Case4:08-cv-05261-SBA   Document21-2   Filed03/13/09   Page46 of 58

Because of our focus on automation and high volumes, our operations do not involve, for the vast majority of our sales, any human-based review of content. Although our websites' terms of use specifically require customers to represent that they have the right and authority to reproduce a given content and that the content is in full compliance with all relevant laws and regulations, we do not have the ability to determine the accuracy of these representations on a case-by-case basis. There is a risk that a customer may

30

Table of Contents

supply an image or other content that is the property of another party used without permission, that infringes the copyright or trademark of another party, or that would be considered to be defamatory, hateful, racist, scandalous, obscene, or otherwise offensive, objectionable or illegal under the laws or court decisions of the jurisdiction where that customer lives. There is, therefore, a risk that customers may intentionally or inadvertently order and receive products from us that are in violation of the rights of another party or a law or regulation of a particular jurisdiction. If we should become legally obligated in the future to perform manual screening and review for all orders destined for a jurisdiction, we will encounter increased production costs or may cease accepting orders for shipment to that jurisdiction which could substantially harm our business and results of operations. In addition, if we were held liable for actions of our customers, we could be required to pay substantial penalties, fines or monetary damages.

**Purported Federal class action lawsuits have been filed asserting substantially identical claims alleging that certain of our customers were, without their knowledge or consent, enrolled in and billed for membership discount programs offered by third party merchants on our VistaPrint.com website; and our reputation, revenues and results of operations could be adversely affected if we or the third party merchants are unable to successfully resolve these lawsuits or similar claims that may be brought in the future.**

During each of the last three fiscal years, we generated a portion of our revenue from order referral fees, revenue share and other fees paid to us by third party merchants for customer click-throughs, distribution of third-party promotional materials, and referrals arising from products and services of the third party merchants we offer to our customers on our website, which we collectively refer to as referral fees. Some of these third party referral-based offers are for memberships in discount programs or similar promotions made to customers who have purchased products from us, in which we receive a payment from the third party merchants for every customer that accepts the promotion. Certain of these third party membership discount programs have been the subject of consumer complaints, litigation, and regulatory actions alleging that the enrollment and billing practices involved in the programs violate various consumer protection laws or are otherwise deceptive. For example, various state attorneys general have brought similar consumer fraud lawsuits against certain of the third party merchants asserting that they have not adequately disclosed the terms of their offers and have not obtained proper approval from consumers before debiting the consumers' bank account or billing the consumers' credit card. We have in the past from time to time received complaints from our customers regarding certain of the membership discount programs offered on our websites.

Between July 29, 2008, and September 11, 2008, a total of seven purported class action lawsuits were filed against VistaPrint USA, Inc., VistaPrint Corp. and/or VistaPrint Ltd., and two third party merchants, in U.S. Federal District Court in six different states, asserting substantially identical claims alleging that the defendants violated certain Federal and state consumer protection laws in connection with the offer of membership discount programs on our VistaPrint.com website. The plaintiffs allege, among other things, that after ordering products on our VistaPrint.com website they were enrolled in certain membership discount programs and that monthly subscription fees for the programs were subsequently charged directly to their credit or debit cards, in each case purportedly without their knowledge or authorization. The plaintiffs are seeking recovery of an unspecified amount of damages, including statutory and punitive damages, together with interest and legal costs, and are also seeking to prevent us and the merchants from engaging in similar practices in the future.

We and the third party merchants may receive other complaints in the future regarding these types of membership discount programs. Governmental authorities also may institute proceedings alleging similar alleged misconduct. The purported class action lawsuits or any other private or governmental claims or actions that may be brought against us in the future relating to these third party membership programs could result in our being obligated to pay substantial damages or incurring substantial legal fees in defending claims. These damages and fees could be disproportionate to the revenues we generate through these relationships, which would have an adverse affect on our results of operations. Even if we are successful in defending against these claims, such a defense may result in distraction of management and significant costs. In addition, customer dissatisfaction or a significant reduction in or termination of the membership discount offers on our website as a result of these claims could have a negative impact on our brand, revenues and profitability.

**We expect that revenues we derive from third party referral programs, particularly membership discount programs, will decrease in the future, which could adversely affect our results of operations.**

31

Table of Contents

For the three and six months ended December 31, 2008, we derived approximately 4.6% and 5.3% of our total revenues from referral fees generated from all sources, as compared to 6.3% and 7.3% for the same periods in 2007. In each of those fiscal periods, the majority of the referral fee revenue was derived from membership discount programs. Over the next several fiscal years, we expect referral fee revenue to continue to decline as a percent of total revenues and possibly in absolute dollars. We expect that referral fee revenue from all sources will account for between 2% and 5% of our total revenues by the end of calendar year 2010. Of that amount, we expect that referral fee revenue from membership discount programs will decline in absolute dollar terms over that period of time, including possibly to as low as zero. Actual referral fees, including membership discount programs, could generate more or less of our total revenues than we currently expect due to a variety of factors, including, among others, strategic operating decisions. We expect to partially offset the anticipated reductions in referral fee revenues from a variety of sources, but if we are not successful in doing so our revenues and profitability could be adversely affected.

**Our practice of offering free products and services could be subject to judicial or regulatory challenge which, if successful, would hinder our ability to attract customers and generate revenue.**

We regularly offer free products and services as an inducement for customers to try our products and services. Although we believe that we conspicuously and clearly communicate all details and conditions of these offers—for example, that customers are required to pay shipping and processing charges to take advantage of a free product offer—we have in the past, and may in the future, be subject to claims from individuals or governmental regulators in the United States and other countries that our free offers are misleading or do not comply with applicable legislation or regulation. For example, in 2004, one of our subsidiaries and our predecessor corporation were named as defendants in a class action lawsuit alleging that the shipping and handling fees we charged in connection with our free business card offer violated sections of the California Business and Professions Code that limit the amount that may be charged for shipping and handling in connection with a prize or gift. In addition, customers and competitors have filed complaints with governmental and standards bodies in other jurisdictions claiming that customers were misled by the terms of our free offers. Our free product offers could be subject to additional challenges in the future. If we are subject to further actions in the future, or if we are compelled or determine to curtail or eliminate our use of free offers as the result of any such actions, our business prospects and results of operations could be materially harmed.

**Our failure to protect our network and the confidential information of our customers against security breaches and to address risks associated with credit card fraud could damage our reputation and brand and substantially harm our business and results of operations.**

A significant prerequisite to online commerce and communications is the secure transmission of confidential information over public networks. Our failure to prevent security breaches of our network could damage our reputation and brand and substantially harm our business and results of operations. Currently, a majority of our sales are billed to our customers' credit card accounts directly. We retain our customers' credit card information for a limited time following a purchase of products for the purpose of issuing refunds. We rely on encryption and authentication technology licensed from third parties to effect secure transmission of confidential information, including credit card numbers. Advances in computer capabilities, new discoveries in the field of cryptography or other related developments, among other factors, may result in a compromise or breach of our network or the technology used by us to protect our network and our customer transaction data including credit card information. Any such compromise of our network or our security could damage our reputation and brand and expose us to a risk of loss or litigation and possible liability which would substantially harm our business and results of operations. In addition, anyone who is able to circumvent our security measures could misappropriate proprietary information or cause interruptions in our operations. We may need to expend significant resources to protect against security breaches or to address problems caused by breaches.

In addition, under current credit card practices, we may be liable for fraudulent credit card transactions conducted on our websites, such as through the use of stolen credit card numbers, because we do not obtain a cardholder's signature. To date, quarterly losses from credit card fraud have not exceeded 1% of total revenues in any quarter, but we continue to face the risk of significant losses from this type of fraud. Although we seek to maintain insurance to cover us against this risk, we cannot be certain that our coverage will be adequate to cover liabilities actually incurred as a result of such fraud or that insurance will continue to be available to us on economically reasonable terms, or at all. Our failure to limit fraudulent credit card transactions could damage our reputation and brand and substantially harm our business and results of operations.

**We are subject to payment-related risks.**

We accept payments for our products and services on our websites by a variety of methods, including credit card, debit card and bank check. As we offer new payment options to our customers, we may be subject to additional regulations, compliance requirements, and fraud risk. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower our profit margins or require that we charge our customers more for our products. We are also subject to payment card association and similar operating rules and requirements, which could change or be reinterpreted to make it difficult or impossible for us to comply. If we fail to comply with these rules and requirements, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from our customers or

facilitate other types of online payments, and our business and operating results could be materially adversely affected.

32

Table of Contents

**We may be subject to product liability claims if people or property are harmed by the products we sell.**

Some of the products we sell may expose us to product liability claims relating to personal injury, death, or property damage, and may require product recalls or other actions. Although we maintain product liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on reasonable terms, or at all.

33

Table of Contents

## Risks Related to Our Corporate Structure

**Non-Bermuda tax authorities may tax some or all of VistaPrint Limited's income, which would increase our effective tax rate and adversely affect our earnings.**

VistaPrint Limited is organized in Bermuda and conducts business through operations within Bermuda. Bermuda does not currently impose income taxes on our operations. Management services for VistaPrint Limited are provided to VistaPrint Limited by employees of our United States subsidiary, who are all based in the United States. We have endeavored to structure our business so that all of our non-Bermuda operations are carried out by our local subsidiaries and VistaPrint Limited's business income is, in general, not subject to tax in these non-Bermuda jurisdictions, such as Jamaica, the United States, Canada, Spain, Switzerland or the Netherlands. VistaPrint Limited has filed tax returns on the basis that it is not engaged in business in these non-Bermuda jurisdictions. Many countries' tax laws, including but not limited to United States tax law, do not clearly define activities that constitute being engaged in a business in that country. The tax authorities in these countries could contend that some or all of VistaPrint Limited's income should be subject to income or other tax or subject to withholding tax. If VistaPrint Limited's income is taxed in jurisdictions other than Bermuda, such taxes will increase our effective tax rate and adversely affect our results of operations.

United States corporations are subject to United States federal income tax on the basis of their worldwide income. Non-U.S. corporations generally are subject to United States federal income tax only on income that has a sufficient nexus to the United States. On October 22, 2004, the United States enacted the American Jobs Creation Act of 2004, or the AJCA. Under the AJCA, non-U.S. corporations that after March 4, 2003 complete the acquisition of substantially all of the properties of a United States corporation and that meet certain ownership, operational and other tests are treated as United States corporations for United States federal income tax purposes and, therefore, are subject to United States federal income tax on their worldwide income. The amalgamation of our predecessor U.S. corporation with VistaPrint Limited occurred in April 2002. The AJCA grants broad regulatory authority to the Secretary of the Treasury to provide regulations as may be appropriate to determine whether a non-U.S. corporation is treated as a United States corporation. We do not believe that the relevant provisions of the AJCA as currently enacted apply to VistaPrint Limited, but there can be no assurance that the United States Internal Revenue Service will not challenge this position or that a court will not sustain any such challenge. Furthermore, at various times during the last few years there have been legislative proposals in the U.S. Congress which, if enacted into law, would retroactively change the March 4, 2003 AJCA measurement date to March 20, 2002. A successful challenge by the Internal Revenue Service, or a change of the March 4, 2003 date in the AJCA to an earlier date, could result in VistaPrint Limited being subject to tax in the United States on its worldwide income, which would increase our effective rate of tax and adversely affect our earnings.

**Our intercompany arrangements may be challenged, resulting in higher taxes or penalties and an adverse effect on our earnings.**

We operate pursuant to written intercompany service and related agreements, which we also refer to as transfer pricing agreements, among VistaPrint Limited and its subsidiaries. These agreements establish transfer prices for printing, marketing, management, technology development and other services performed for VistaPrint Limited. Transfer prices are prices that one company in a group of related companies charges to another member of the group for goods, services or the use of property. If two or more affiliated companies are located in different countries, the tax laws or regulations of each country generally will require that transfer prices be the same as those between unrelated companies dealing at arms' length. With the exception of our Dutch operations, our transfer pricing procedures are not binding on applicable tax authorities and no official authority in any other country has made a determination as to whether or not we are operating in compliance with its transfer pricing rules. If tax authorities in any of these countries were to successfully challenge our transfer prices as not reflecting arms' length transactions, they could require us to adjust our transfer prices and thereby reallocate our income to reflect these revised transfer prices. A reallocation of taxable income from a lower tax jurisdiction to a higher tax jurisdiction would result in a higher tax liability to us. In addition, if the country from which the income is reallocated does not agree with the reallocation, both countries could tax the same income, resulting in double taxation. Changes in laws and regulations may require us to change our transfer pricings or operating procedures. If tax authorities were to allocate income to a higher tax jurisdiction, subject our income to double taxation or assess penalties, it would result in a higher tax liability to us, which would adversely affect our earnings.

**We will pay taxes even if we are not profitable on a consolidated basis which would cause increased losses and further harm to our results of operations.**

The intercompany service and related agreements among VistaPrint Limited and our direct and indirect subsidiaries in general guarantee that the subsidiaries realize profits. As a result, even if the VistaPrint group is not profitable on a consolidated basis, the majority of our subsidiaries will be profitable and incur income taxes in their respective jurisdictions. If we are unprofitable on a consolidated basis, as has been the case in some prior periods, this structure will increase our consolidated losses and further harm our results of operations.

34

Table of Contents

**We may be treated as a passive foreign investment company for United States tax purposes, which may subject United States shareholders to adverse tax consequences.**

If our passive income, or our assets that produce passive income, exceed levels provided by law for any taxable year, we may be characterized as a passive foreign investment company, or a PFIC, for United States federal income tax purposes. If we are treated as a PFIC, U.S. holders of our common shares would be subject to a disadvantageous United States federal income tax regime with respect to the distributions they receive and the gain, if any, they derive from the sale or other disposition of their common shares. Under the PFIC rules, unless U.S. holders make an election available under the Internal Revenue Code of 1986, as amended, such shareholders would be liable to pay United States federal income tax at the then prevailing income tax rates on ordinary income plus interest upon excess distributions and upon any gain from the disposition of our common shares, as if the excess distribution or gain had been recognized ratably over the shareholder's holding period of our common shares.

We believe that we were not a PFIC for the tax year ended June 30, 2008 and we expect that we will not become a PFIC in the foreseeable future. However, whether we are treated as a PFIC depends on questions of fact as to our assets and revenues that can only be determined at the end of each tax year. Accordingly, we cannot be certain that we will not be treated as a PFIC for our current tax year or for any subsequent year.

**If a United States shareholder acquires 10% or more of our common shares, it may be subject to increased United States taxation under the "controlled foreign corporation" rules.**

Each "10% U.S. Shareholder" of a non-U.S. corporation that is a "controlled foreign corporation," or CFC, for an uninterrupted period of 30 days or more during a taxable year, and that owns shares in the CFC directly or indirectly through non-U.S. entities on the last day of the CFC's taxable year, must include in its gross income for United States federal income tax purposes its pro rata share of the CFC's "subpart F income," even if the subpart F income is not distributed. A non-U.S. corporation is considered a CFC if one or more 10% U.S. Shareholders together own more than 50% of the total combined voting power of all classes of voting shares of the non-U.S. corporation or more than 50% of the total value of all shares of the corporation on any day during the taxable year of the corporation. A 10% U.S. Shareholder is a U.S. person, as defined in the Internal Revenue Code, that owns at least 10% of the total combined voting power of all classes of shares entitled to vote of the non-U.S. corporation. For purposes of determining whether a corporation is a CFC, and therefore whether the more-than-50% and 10% ownership tests have been satisfied, shares owned include shares owned directly or indirectly through non-U.S. entities and shares considered owned under constructive ownership rules. The attribution rules are complicated and depend on the particular facts relating to each investor. For taxable years in which we are a CFC for an uninterrupted period of 30 days or more, each of our 10% U.S. Shareholders will be required to include in its gross income for United States federal income tax purposes its pro rata share of our subpart F income, even if the subpart F income is not distributed to enable such taxpayer to satisfy this tax liability. Based upon our existing share ownership, we do not believe we are a CFC.

**We are incorporated under the laws of Bermuda, and the majority of our assets are located outside the United States, which may make it difficult for shareholders to enforce civil liability provisions of the federal or state securities laws of the United States.**

We are incorporated under the laws of Bermuda, and over 90% of our assets are located outside of the United States. It may not be possible to enforce court judgments obtained in the United States against us in Bermuda or in countries, other than the United States, where we have assets based on the civil liability provisions of the federal or state securities laws of the United States. In addition, there is significant doubt as to whether the courts of Bermuda and other countries would recognize or enforce judgments of United States courts obtained against us or our directors or officers based on the civil liabilities provisions of the federal or state securities laws of the United States or would hear actions against us or those persons based on those laws. The United States and Bermuda do not currently have a treaty providing for the reciprocal recognition and enforcement of judgments in civil and commercial matters. Therefore, a final judgment for the payment of money rendered by any federal or state court in the United States based on civil liability, whether or not based solely on United States federal or state securities laws, would not automatically be enforceable in Bermuda. Similarly, those judgments may not be enforceable in countries other than the United States where we have assets. Therefore, even if successful in litigation instituted against VistaPrint in the United States, our shareholders may not be able to recover all or a portion of the damages that they are awarded by a court in the United States.

**Bermuda law differs from the laws in effect in the United States and may afford less protection to shareholders.**

Our shareholders may have more difficulty protecting their interests than would shareholders of a corporation incorporated in a jurisdiction of the United States. As a Bermuda company, we are governed by the Companies Act 1981 of Bermuda. The Companies Act differs in some material respects from laws generally applicable to United States corporations and shareholders, including provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, shareholder lawsuits and indemnification of directors. In addition, our bye-laws provide that in the event any governmental authority imposes any liability upon us in respect of any shares registered in our share register, dividends, bonuses or other monies paid to a shareholder or in other circumstances, including liabilities resulting from the death of the shareholder, failure by the shareholder to pay any taxes or failure to

pay estate duties, the shareholder will fully indemnify us from all liability arising in connection therewith.

      Under Bermuda law, the duties of directors and officers of a company are generally owed to the company only. Shareholders of Bermuda companies do not generally have rights to take action against directors or officers of the company, and may only do so in

35

Table of Contents

limited circumstances. Directors and officers may owe duties to a company's creditors in cases of impending insolvency. Directors and officers of a Bermuda company must, in exercising their powers and performing their duties, act honestly and in good faith with a view to the best interests of the company and must exercise the care and skill that a reasonably prudent person would exercise in comparable circumstances. Directors have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict and also are under a duty to disclose any personal interest in any material contract or proposed material contract with the company or any of its subsidiaries. If a director or officer of a Bermuda company is found to have breached his duties to that company, he may be held personally liable to the company in respect of that breach of duty. A director or officer may be liable jointly and severally with other directors or officers if it is shown that the director or officer knowingly engaged in fraud or dishonesty. In cases not involving fraud or dishonesty, the liability of the director or officer will be determined by the Bermuda courts on the basis of their estimation of the percentage of responsibility of the director or officer for the matter in question, in light of the nature of the conduct of the director or officer and the extent of the causal relationship between his conduct and the loss suffered.

Our bye-laws provide that we will indemnify our directors and officers in their capacity as such in respect of any loss arising or liability attaching to them by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which a director or officer may be guilty in relation to us other than in respect of his own fraud or dishonesty, which is the maximum extent of indemnification permitted under the Companies Act. Under our bye-laws, each of our shareholders agrees to waive any claim or right of action, other than those involving fraud, against us or any of our officers or directors.

**Anti-takeover provisions in our charter documents and under Bermuda law could make an acquisition of us, which may be beneficial to our shareholders, more difficult and may prevent attempts by our shareholders to replace or remove our current management.**

Provisions in our bye-laws may delay or prevent an acquisition of us or a change in our management. In addition, by making it more difficult for shareholders to replace members of our board of directors, these provisions also may frustrate or prevent any attempts by our shareholders to replace or remove our current management because our board of directors is responsible for appointing the members of our management team. These provisions include:

- a classified board of directors;

- the ability of our board of directors to issue undesignated shares without shareholder approval, which could be used to institute a "poison pill" that would work to dilute the share ownership of a potential hostile acquirer, effectively preventing acquisitions that have not been approved by our board of directors;

- limitations on the removal of directors; and

- advance notice requirements for election to our board of directors and for proposing matters that can be acted upon at shareholder meetings.

In addition, the foregoing factors may prevent or delay our acquisition by a third party, even though such transaction may be in the best interests of our shareholders.

## ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

(a) Not applicable.

(b) On September 29, 2005, our registration statement on Form S-1 (Registration No. 333-125470) was declared effective for our initial public offering, pursuant to which we offered and sold 11,518,320 common shares, of which 5,500,000 were sold by us and 6,018,320, were sold by certain of our shareholders, at an initial public offering price of $12.00 per share. We received net proceeds of approximately $61.4 million (after underwriters' discounts of $4.6 million). We incurred additional, related expenses of approximately $1.6 million, resulting in proceeds, after expenses, to us of approximately $59.8 million.

As of December, 2008, we had not utilized any of the net proceeds from the offering. We intend to use the net proceeds to fund construction and expansion of our production facilities and other operations, possible acquisitions and investments, and working capital, capital expenditures and other general corporate purposes. Pending these uses, we have invested the funds in short-term investment grade and government securities.

(c) On August 12, 2008, we announced that our Board of Directors had authorized our repurchase of up to an aggregate of $50.0 million of our common shares from time to time on the open market. The timing and amount of any shares repurchased have been and will continue to be determined by our management based on its evaluation of market conditions and other factors. The share repurchase authorization expires on February 8, 2010, but may be suspended or discontinued by us at any time. During the three and six months ended December 31, 2008, an aggregate of 2,554,302 common shares were repurchased for $45.5 million. The following table outlines repurchases of our common stock during the three months ended December 31, 2008.

Table of Contents

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Purchased as Part of Publicly Announced Plans or Program | Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2008 through October 31, 2008 | 553,398 | $ 26.56 | 553,398 | $ 35,300,060 |
| November 1, 2008 through November 30, 2008 | 1,151,073 | $ 14.64 | 1,151,073 | $ 18,445,831 |
| December 1, 2008 through December 31, 2008 | 849,831 | $ 16.43 | 849,831 | $ 4,481,708 |
| Total | 2,554,302 | $ 17.82 | 2,554,302 | |

## ITEM 3.  DEFAULTS UPON SENIOR SECURITIES

Not applicable.

## ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

We held our 2008 annual general meeting of shareholders on November 7, 2008. Our shareholders approved each of the following proposals by the votes specified below.

Proposal 1 – To elect Robert S. Keane as our Class III Director for a term of three years.

| Votes For | Votes Withheld |
|---|---|
| 36,088,183 | 937,351 |

The terms of office of the following directors who were not up for re-election at our 2008 annual general meeting of shareholders, continued after our 2008 annual general meeting of shareholders: John J. Gavin, Jr., George Overholser, Louis Page and Richard Riley.

Proposal 2 – To approve our Second Amended and Restated Bye-Laws.

| Votes For | Votes Against | Abstain |
|---|---|---|
| 36,934,120 | 74,925 | 16,488 |

Proposal 3 – To ratify and approve the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2009.

| Votes For | Votes Against | Abstain |
|---|---|---|
| 36,983,200 | 29,117 | 13,217 |

## ITEM 5.  OTHER INFORMATION

Not applicable.

## ITEM 6.  EXHIBITS

31.1     Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Rule 13a-14(a)/15d-14(a), by Chief Executive Officer.

31.2     Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Rule 13a-14(a)/15d-14(a), by Chief Financial Officer.

32.1     Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, by Chief Executive Officer and Chief Financial Officer.

37

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: January 30, 2009

**VISTAPRINT LIMITED**

By:           /s/ MICHAEL GIANNETTO
**Michael Giannetto**
**Chief Financial Officer**
**(Principal Financial and Accounting Officer)**

38

Table of Contents

## EXHIBIT INDEX

31.1      Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Rule 13a-14(a)/15d-14(a), by Chief Executive Officer.

31.2      Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Rule 13a-14(a)/15d-14(a), by Chief Financial Officer.

32.1      Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, by Chief Executive Officer and Chief Financial Officer.

39